#27455-a-GAS

**2016 S.D. 12**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

RONALD RAY FISCHER, JR.,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
CHARLES MIX COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BRUCE V. ANDERSON
Judge

* * * *

MARTY J. JACKLEY
Attorney General

KELLY MARNETTE
BRENT K. KEMPEMA
Assistant Attorneys General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.


TIMOTHY R. WHALEN
Lake Andes, South Dakota                    Attorney for defendant
                                        and appellant.


* * * *

ARGUED ON
JANUARY 13, 2016

OPINION FILED **02/03/16**

#27455

SEVERSON, Justice

[¶1.]        Ronald Fischer, Jr., was convicted of driving with alcohol in his blood

or while under the influence of alcohol or drug, two counts of vehicular homicide,

one count of possession of marijuana, and one count of ingesting a non-alcoholic

substance to become intoxicated.  He appeals.  He asserts that law enforcement and

hospital personnel took blood samples from him in violation of his constitutional

rights, and, therefore, the court erred when it refused to suppress the samples.  We

affirm.

## Background

[¶2.]        On the night of July 8, 2013, around 8:30, Fischer failed to stop at a T-

intersection of two highways in Pickstown, South Dakota.  He drove through the

intersection and into the parking lot of the Dakota Inn Hotel at a high rate of speed.

He struck a boat and two persons standing in the parking lot.  Fischer's vehicle

then collided with a pick-up and another vehicle.  The two persons struck by

Fischer's vehicle were immediately killed.  The accident resulted in a large debris

field that included multiple body parts from both of the victims.  A physician's

assistant student was among the witnesses to the accident.  After checking on both

victims, the student began administering medical care to Fischer, who was still in

the driver's seat of his vehicle.

[¶3.]        Three Charles Mix County deputy sheriffs responded to the scene of

the accident along with members of the local volunteer fire department and

emergency medical technicians.  Deputies Rolston and Lake arrived at 8:47 p.m.,

and Deputy DeBuhr arrived one minute later.  Deputy Rolston assisted the student

-1-

and noticed that Fischer smelled of alcohol. Deputy DeBuhr also noticed the odor of alcohol when he helped extricate Fischer from his vehicle. Deputy Lake attempted to control the scene and the number of onlookers. Deputy Lake was responsible for preserving evidence, which included skid marks, body parts, and vehicle parts. Additionally, she attempted to identify the victims, gathered information from witnesses, and took pictures of the scene, including Fischer and his vehicle. While taking these pictures, she detected the odor of alcohol emanating from Fischer's vehicle. Fischer was taken by ambulance to the Wagner Hospital.

[¶4.] At 9:10 p.m., approximately twenty minutes after the deputies had arrived on the scene, and after Fischer had been taken away by ambulance, Sheriff Thaler arrived on the scene. By this time, light precipitation had begun to fall. Sheriff Thaler was briefed on the accident and took control of delegating responsibilities and managing the scene. He told the deputies to identify witnesses and tasked Deputy Rolston with taking pictures. Sheriff Thaler thought that it may start raining, and he asked the EMTs and firefighters to assist with securing the scene using police tape and tarps to cover the physical evidence. Other than those present at the scene, only two other law enforcement officers worked for Sheriff Thaler. Both officers were unavailable that evening, one because he was working on a drug sting and the other was needed at the office to respond to all other calls that came in.

[¶5.] Deputy Debuhr testified at the suppression hearing that shortly after Sheriff Thaler arrived on scene, the deputy informed the sheriff that alcohol may be a factor. A volunteer fireman, who assisted in removing Fischer from Fischer's

vehicle, also told the sheriff that Fischer smelled of alcohol. Sheriff Thaler knew a helicopter was on its way to transport Fischer from the Wagner Hospital to a hospital in Sioux Falls, so he sent Deputy DeBuhr to the Wagner Hospital to obtain a blood sample from Fischer. He did not tell Deputy Debuhr to obtain a search warrant, and he did not think it would be possible to obtain one before Fischer was transported to Sioux Falls.

[¶6.] At the Wagner Hospital, Dr. Pinter treated Fischer and ordered several tests on Fischer, including a blood test to determine Fischer's blood alcohol content (BAC). Dr. Pinter's training taught him that a trauma patient should have his blood tested to determine BAC for treatment purposes. The test showed that Fischer's BAC was .274.

[¶7.] As Deputy DeBuhr was driving to the Wagner Hospital, he saw the helicopter coming in to transport Fischer to Sioux Falls. He arrived at 9:38 p.m., the same time as the helicopter. At 9:45 p.m., Deputy DeBuhr directed a nurse to draw a sample of Fischer's blood. That sample showed Fischer's BAC at .232 and showed the presence of cannabinoids. Thirty minutes later, Fischer was discharged from the Wagner Hospital and flown to Sioux Falls.

[¶8.] As a result of the incident, Fischer was indicted on the following seven counts: driving or control of vehicle with alcohol in the blood or while under the influence of alcohol or drug, two counts of first-degree manslaughter, two counts of vehicular homicide, possession of marijuana, and ingesting a non-alcoholic substance to become intoxicated. Fischer moved to suppress evidence of the blood draws, alleging that they had been obtained contrary to his rights under the Fourth

Amendment of the United States Constitution, applicable to the states via the Fourteenth Amendment, and Article VI, § 11 of the South Dakota Constitution.

[¶9.]     The circuit court found that the blood draw ordered by Dr. Pinter was done at the sole request of a physician, a private individual, and thus constitutional protections did not apply and the results would not be suppressed.[1]  The circuit court also found that Sheriff Thaler was busy directing the investigation, which included: helping those injured; preserving evidence from the rain by covering it; preserving evidence by photographing it; finding all evidence, including body parts; finding witnesses; interviewing witnesses or giving them statement forms; performing crowd control because curious individuals were arriving to see what happened; taping off the scene; getting the blood sample from Fischer; and coordinating with Highway Patrol.  Therefore, it refused to suppress the blood draw done at the direction of Deputy DeBuhr, finding that exigent circumstances existed. Fischer appeals the circuit court's decision, alleging that both draws should have been suppressed.

### Standard of Review

[¶10.]     "We review the court's grant or denial of a motion to suppress involving an alleged violation of a constitutionally protected right under the de novo standard of review.  The court's findings of fact are reviewed under the clearly erroneous standard, but we give no deference to the court's conclusions of law."

---

1.     Fischer stipulated to the release of his medical records from the Wagner Hospital.  Therefore, the circuit court also found that he had waived any claim of physician-patient privilege.  Fischer has not appealed that decision.

*State v. Fierro*, 2014 S.D. 62, ¶ 12, 853 N.W.2d 235, 239 (quoting *State v. Smith*, 2014 S.D. 50, ¶ 14, 851 N.W.2d 719, 723).

## Analysis

[¶11.]     Fischer maintains that both blood draws, one done at the direction of Dr. Pinter and one done at the direction of Deputy DeBuhr, should have been suppressed.  We first address the blood draw ordered by Dr. Pinter.  Protection against unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and Article VI, § 11 of the South Dakota Constitution applies to governmental action.  *See United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656, 80 L. Ed. 2d 85 (1984); *State v. Schwartz*, 2004 S.D. 123, ¶ 11, 689 N.W.2d 430, 434.  "[I]t is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *Jacobsen*, 466 U.S. at 113, 104 S. Ct. at 1656 (quoting *Walter v. United States*, 447 U.S. 649, 662, 100 S. Ct. 2395, 2404, 65 L. Ed. 2d. 410 (1980)).  Additionally, "suppression of evidence is not a personal constitutional right, but a judicially created remedy to deter constitutional violations by government officials."  *State v. Running Shield*, 2015 S.D. 78, ¶ 7, 871 N.W.2d 503, 506 (quoting *State v. Sorenson*, 2004 S.D. 108, ¶ 8, 688 N.W.2d 193, 196).

[¶12.]     Fisher argues that the "Fourth Amendment totality-of-the-circumstances analysis [that applies] to law enforcement blood samples . . . should apply to the hospital draw in this case."  He claims that law enforcement and medical personnel in small communities have a close relationship because of the

"prevalence of alcohol related offenses in [these] communities" and the frequent contact between the two groups such as seeking assistance in blood draws.[2] Fischer asks us to determine that the hospital blood draw was obtained in violation of his constitutional rights because it had a dual purpose of medical and investigatory in light of this alleged close relationship. Fischer's arguments are unavailing, particularly as here, where law enforcement had absolutely no involvement in the blood draw. Officers were not present when the blood draw was ordered by Dr. Pinter or performed by hospital staff. We will not equate medical decisions with law enforcement action based on the alleged "sundry matters that bring them together" and the relationship that allegedly results. When hospital staff draws blood solely for medical purposes, there is no unconstitutional governmental activity to deter and suppression is an inappropriate remedy in this case. *See id.*

[¶13.] Next, we consider Fischer's assertion that the second blood draw should have been suppressed because law enforcement did not obtain a search warrant prior to drawing Fisher's blood. "The Fourth Amendment's prohibition against unreasonable searches and seizures requires generally the issuance of a warrant by a neutral judicial officer based on probable cause prior to the execution of a search or seizure of a person." *Fierro*, 2014 S.D. 62, ¶ 15, 853 N.W.2d at 240 (quoting *Smith*, 2014 S.D. 50, ¶ 15, 851 N.W.2d at 724). "Warrantless searches are per se unreasonable, apart from a few, well-delineated exceptions,' and it is the State's burden to prove that the search at issue falls within a well-delineated exception to the warrant requirement." *Id.* (quoting *State v. Hess*, 2004 S.D. 60,

---

2.   Fischer cites no evidence or authority for these claims.

¶ 23, 680 N.W.2d 314, 324). The State contends that the exigent circumstances exception is applicable in this case. "The exigent circumstances exception is one of the well-delineated exceptions to the warrant requirement." *Id.* ¶ 17. It "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Missouri v. McNeely*, ___ U.S. ___, ___, 133 S. Ct. 1552, 1558, 185 L. Ed. 2d. 696 (2013) (quoting *Kentucky v. King*, 563 U.S. 452, 460, 131 S. Ct. 1849, 1856, 179 L. Ed. 2d. 865 (2011)).

[¶14.]     Fischer maintains that the State cannot establish that exigent circumstances existed in this case because the United States Supreme Court has determined that "the natural dissipation of alcohol in the bloodstream" does not establish a "*per se* exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations." *See McNeely*, 133 S. Ct. at 1558. Moreover, he contends that any reliance on *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966) is misplaced because that rationale "has been squarely and decisively rejected by the United States Supreme Court in the *McNeely* decision[.]" According to Fischer, the State has no exigent circumstances other than the dissipation of blood in this case; therefore, the warrantless blood draw was unconstitutional and should have been suppressed. We disagree.

[¶15.]     In *Schmerber*, the Supreme Court "upheld a warrantless blood test of an individual arrested for driving under the influence of alcohol because the officer 'might reasonably have believed that he was confronted with an emergency, in

which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence.'" *McNeely*, 133 S. Ct. at 1552 (quoting *Schmerber*, 384 U.S. at 770, 86 S. Ct. at 1826). The Court reasoned that:

> [T]he percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.

*Schmerber*, 384 U.S. at 770-71, 86 S. Ct. at 1836.

[¶16.] Fischer misconstrues the *McNeely* decision as rejecting *Schmerber*'s rationale. Instead, the *McNeely* Court explained that the "analysis in *Schmerber* fits comfortably within our case law applying the exigent circumstances exception. In finding the warrantless blood test reasonable in *Schmerber*, we considered all of the facts and circumstances of the particular case and carefully based our holding on those specific facts." *McNeely*, 133 S. Ct. at 1560. The *McNeely* Court reaffirmed that "the reasonableness of a warrantless search under the exigency exception to the warrant requirement must be evaluated on the totality of the circumstances." *Id.* "[T]he metabolization of alcohol in the bloodstream and the ensuing loss of evidence are among the factors that must be considered in deciding whether a warrant is required." *Id.* at 1568. The *McNeely* Court further explained that it did "not doubt that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream *will* support an exigency justifying a properly conducted warrantless blood test. That, however, is a reason

to decide each case on its facts, as we did in *Schmerber*[.]" *Id.* at 1561 (emphasis added).

[¶17.]        According to the Supreme Court's guidance on the matter, we examine the totality of the circumstances to determine whether law enforcement faced exigent circumstances that justified the warrantless blood draw. *See id.* at 1559. At a high rate of speed, Fischer struck multiple vehicles, a boat, and two people, who were standing in a parking lot and immediately killed. The aftermath was a major crime scene on a public golf course. The accident occurred at approximately 8:30 p.m. and at a time when the weather was unstable. At the suppression hearing, Sheriff Thaler testified that all personnel available to him were dispatched to the scene, including state highway patrol troopers. Only one deputy remained in the office to handle other matters that arose in Charles-Mix County that night. The circuit court found that the "magnitude of the accident and the size of the crime scene could not be managed without a great deal of help. . . . The Sheriff, Deputies, and Troopers were individually required to help at the scene rather than make efforts to obtain a warrant. . . . [They] worked on the scene until the early hours of the morning." Suffice it to say that the nature of the fatal injuries received by the victims resulted in an extensive debris field that required immediate attention to ensure that all evidence was located, documented, and secured in the event of potentially imminent rain. Sheriff Thaler enlisted the help of emergency personnel and firemen to cover body parts and evidence with tarps. The circuit court found that an unusually large number of witnesses had to be identified. Traffic and crowd control functions also needed to be performed. Therefore, the court found that law

enforcement reasonably believed that other tasks they were performing took priority over taking time to get a warrant.

[¶18.] Fischer had also suffered serious injuries that required emergency medical care. He was taken by ambulance to the hospital in Wagner. Before he even arrived at the hospital, an air ambulance was dispatched there. The court found that Deputy Debuhr "felt a sense of urgency because he would have missed the helicopter had he stopped to obtain a warrant." It found that Sheriff Thaler did not believe he had the resources to prepare an affidavit for a warrant. As the court found, Sheriff Thaler believed he needed to obtain the blood draw before Fischer was airlifted because the officers did not know how medical procedures, such as possible blood transfusions or intravenous fluids could affect Fischer's BAC; there was a possibility that intravenous fluid could compromise the integrity of the BAC testing. Once Fischer departed the Wagner Hospital he was unavailable to law enforcement for several hours. The court found that law enforcement did not have access to Fischer again until 12:43 a.m., a little over four hours after the accident.

[¶19.] Fischer maintained at the suppression hearing, as he does now, that our statutes allow warrants to be obtained quickly. He asserts that the officers "would have needed less than 7 minutes of their time to secure a search warrant." The Supreme Court has recognized that "technological developments that enable police officers to secure warrants more quickly, and do so without undermining the neutral magistrate judge's essential role as a check on police discretion, are relevant to an assessment of exigency." *McNeely*, 133 S. Ct. at 1562-63. However, the circuit court squarely rejected Fischer's argument at the suppression hearing "that law

enforcement could have obtained a telephonic warrant in under five minutes[.]" As the court explained, although SDCL 23A-35-5, -6 allow officers to obtain telephonic warrants, the officer seeking a warrant must still prepare a physical document to be read to the magistrate. *See* SDCL 23A-35-6 ("Prior to approval of a warrant issued pursuant to § 23A-35-5, the committing magistrate shall require the law enforcement officer or the prosecuting attorney who is requesting the warrant to read to him verbatim the contents of the warrant."). Here, an officer would have needed to drive six miles from the scene, to Lake Andes, to prepare the warrant. According to Sheriff Thaler and Deputy Debuhr, the preparation takes roughly 30 to 60 minutes. Once the officer prepared the warrant, called the magistrate, read the warrant, and obtained approval, he or she would need to drive from Lake Andes to the Wagner Hospital, which is roughly a distance of 15 miles. Therefore, the court found it unlikely that the officers would have been able to obtain a warrant prior to Fischer being airlifted out of Charles Mix County. *See* SDCL 23A-35-2 ("A search warrant authorized by this chapter may be issued by a committing magistrate in the county where the property sought is located, on the request of a law enforcement officer or prosecuting attorney.").

[¶20.]     We likewise conclude that these facts established exigent circumstances such that the warrantless blood draw in this case was reasonable. The Supreme Court has recognized that although "experts can work backwards . . . to determine the BAC at the time of the alleged offense, longer intervals may raise questions about the accuracy of the calculation. For that reason, exigent circumstances justifying a warrantless blood sample may arise in the regular course

of law enforcement due to delays from the warrant application process." *McNeely*, 133 S. Ct. at 1563. Deputy DeBuhr arrived at the hospital at the same time as the helicopter. Dr. Pinter testified during the suppression hearing that he would not have kept Fischer at the hospital while law enforcement obtained a warrant. All other available law enforcement officers were busy attending to the accident scene. No one knew the impact that medical care would have on Fischer's BAC, and Fischer's departure via helicopter to receive medical care was imminent. The officers faced the possibility that evidence of alcohol would be destroyed or lost by the time they secured a warrant. This case presents those "special facts" which the Supreme Court anticipated:

> "[S]pecial facts", such as the need for the police to attend to a car accident, . . . the procedures in place for obtaining a warrant or the availability of a magistrate judge, may affect whether the police can obtain a warrant in an expeditious way and therefore may establish exigency that permits a warrantless search. The relevant factors in determining whether a warrantless search is reasonable, including the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence, will no doubt vary depending upon the circumstances in the case.

*McNeely*, 133 S. Ct. at 1568.

[¶21.]     Fischer argues that it was law enforcement's "neglect and failure to do their job correctly [that] created the exigent circumstances[.]" *See King*, 563 U.S. at 470, 131 S. Ct. at 1862 ("Any warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency."). He argues:

> in light of the type of accident and the horrific nature of the same, it was incumbent on the part of law enforcement to mobilize every available law enforcement officer and not simply try to handle the crime scene . . . with just the Sheriff's staff, two highway patrol officers, and volunteer EMTs and

> firefighters. The failure to mobilize sufficient staff and officers to handle the extensive accident scene was not Fischer's fault and is not an exigent circumstance[.]

Fischer thereby admits that the accident scene was "horrific" and "extensive" but claims law enforcement officers were negligent because they did not request more assistance. Although Fischer lists a number of agencies he believes Sheriff Thaler could have called that night, he does not refer us to any evidence in the record to support his assertions. We have no indication as to which agencies Sheriff Thaler could have called or what they could have contributed. Sheriff Thaler testified at the suppression hearing that there are no city officers in Pickstown. He also testified that although he can request assistance through state radio for state troopers or DCI, he does not control who responds to requests for assistance. State troopers were called and present at the scene. The record does not reflect that law enforcement acted negligently or created the exigent circumstances in this case.

**Conclusion**

[¶22.] Blood drawn by hospital personnel for medical purposes is not subject to Fourth Amendment protection, and therefore suppression of the draw was not warranted. In regard to the blood draw ordered by law enforcement, after reviewing the totality of the circumstances, exigent circumstances existed such that the warrantless blood draw of Fischer was objectively reasonable. Consequently, we affirm.

[¶23.] GILBERTSON, Chief Justice, and ZINTER and WILBUR, Justices, and SOGN, Circuit Court Judge, concur.

[¶24.] SOGN, Circuit Court Judge, sitting for KERN, Justice, disqualified.