#29070-a-SRJ
**2020 S.D. 67**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                     Plaintiff and Appellee,

   v.

JOSHUA DAVID VORTHERMS,                     Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBIN J. HOUWMAN
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

BRIGID C. HOFFMAN
Assistant Attorney General
Pierre, South Dakota                     Attorneys for plaintiff and
                                         appellee.


NICHOLE A. CARPER of
Burd & Carper Law Office
Sioux Falls, South Dakota                     Attorneys for defendant and
                                              appellant.

* * * *

ARGUED
OCTOBER 7, 2020
OPINION FILED **12/02/20**

#29070

JENSEN, Justice

[¶1.] A jury convicted Joshua Vortherms of two counts of vehicular homicide, one count of vehicular battery, and driving while under the influence of alcohol. Vortherms appeals contending that the circuit court erred in denying his motion to suppress a blood draw obtained without a search warrant. Vortherms also requests that this Court review his ineffective assistance of counsel claim on direct appeal. We affirm.

**Facts and Procedural History**

[¶2.] At approximately 2:15 a.m. on Saturday, July 1, 2017, Christopher Schoepf and his family were driving west on I-90 towards Sioux Falls after spending the evening at the Luverne, Minnesota drive-in theater. Schoepf, an off-duty detective with the Sioux Falls Police Department, saw skid marks on the road and a cloud of dust in the ditch off the interstate near the Brandon exit. He also observed a shirtless man, later identified as Vortherms, standing and waving on the side of the road. Schoepf turned his vehicle around to assist. Schoepf's girlfriend called 911 to report the accident at 2:18 a.m.

[¶3.] When Schoepf got out of his car, he could not locate the man who had been on the side of the road. Using his flashlight, Schoepf observed a white pickup and a black Subaru lying on its passenger side in the ditch. Both vehicles were heavily damaged. Schoepf heard a girl's voice crying out for help from the ditch. He found the girl trapped in the backseat of the Subaru. Schoepf did not see anyone else in the Subaru, but he observed a man who appeared to be deceased lying on the ground nearby.

-1-

[¶4.] The girl, S.F., was eleven years old. She had also been travelling home from the Luverne drive-in theater with her family and had fallen asleep before the crash. S.F. testified that she saw Vortherms exit the white pickup after the accident. S.F. cried for help, and Vortherms walked over to her. He told S.F. that barbed wire prevented him from getting her out of the Subaru, but he would get help. Schoepf arrived minutes after Vortherms left. An ambulance arrived and took S.F. to the hospital where she had surgery for a broken leg.

[¶5.] Meanwhile, Vortherms had walked to a hotel located approximately 1/4 mile from the crash site. The front desk clerk saw that Vortherms was bleeding from his head. The clerk asked Vortherms if he was okay. Vortherms replied that he "hurt his head," and there had been a car accident. The clerk asked if anybody else was hurt. Vortherms said that there were others in the crash and repeated that he had "hurt his head." The clerk called 911.

[¶6.] State Trooper Patrick Bumann responded to the dispatch call and arrived at the hotel at approximately 2:31 a.m. After Bumann arrived, he "was informed that there were multiple fatalities . . . [; and] there might have been one person that was still missing from the scene." Bumann observed that Vortherms was shirtless, missing a shoe, had blood all over the front of his body, and was holding a cloth to a gash on his head. Bumann asked Vortherms for his name and contacted dispatch to verify his identity.

[¶7.] Bumann smelled alcohol on Vortherms's breath and began questioning him about the accident. Vortherms stated that he had been "cruising with a buddy" in the white pickup truck. Vortherms admitted that he had a few drinks, but he

claimed that he had not been driving. Vortherms did not answer any of Bumann's other questions about his "buddy" and claimed that he was unable to remember exactly where he was sitting in the pickup. Vortherms continued to lose blood and passed in and out of consciousness while Bumann questioned him. Bumann did not conduct any field sobriety tests on Vortherms because of his injuries.

[¶8.]     Three other officers, including another state trooper and a Minnehaha County Sheriff's Deputy, arrived at the hotel within several minutes of Bumann. The officers assisted Bumann by rendering first aid to Vortherms. At 2:40 a.m., an ambulance arrived at the hotel to transport Vortherms to the hospital. Bumann continued to question Vortherms while the ambulance crew began treating his injuries. The other officers helped move Vortherms onto a stretcher and into the ambulance.

[¶9.]     Bumann unsuccessfully attempted to take a preliminary breath test (PBT) of Vortherms at the hotel. Another officer eventually managed to take a PBT just before Vortherms was placed in the ambulance that produced a breath alcohol content of .097. The ambulance left the hotel to transport Vortherms to a Sioux Falls hospital at 2:52 a.m. Bumann followed the ambulance to the hospital, which was approximately five miles from the hotel. Bumann testified that the other officers went to the crash site to look for other individuals who may have been hurt or involved in the crash because of Vortherms's statement that he was traveling with his "buddy."

[¶10.]     The ambulance arrived at the hospital at 3:06 a.m. When Bumann arrived, he overheard healthcare personnel discussing that Vortherms had "lost a

lot of blood" and needed to be admitted to surgery. Bumann had five years of experience as a state trooper and had requested around thirty telephonic warrants during his career. Bumann also knew that he needed to draw Vortherms's blood to preserve his blood alcohol content (BAC) for the investigation. Bumann requested a blood draw, believing he did not have time to obtain a search warrant before Vortherms went into surgery. The draw was taken at 3:17 a.m. and produced a BAC of .159.[1]

[¶11.] Back at the scene of the accident, officers identified the man on the ground as S.F.'s father, Shannon Fischer. Fischer's girlfriend, Anna Mason, had also been ejected from the Subaru. Later law enforcement determined that Mason was likely the Subaru's driver. First responders pronounced Fischer and Mason dead on scene. They both suffered fatal injuries from multiple blunt force trauma.

[¶12.] On November 16, 2017, a Minnehaha County Grand Jury indicted Vortherms on two counts of vehicular homicide, vehicular battery, and two alternative counts of driving while intoxicated.[2] Vortherms filed a motion to

---

1. After the warrantless blood draw, Bumann went to his patrol car to obtain a telephonic warrant for two additional blood samples to be taken an hour apart. The warrant was approved at 4:02 a.m. Vortherms was in surgery when Bumann reentered the hospital to deliver the warrant. After surgery, hospital staff drew Vortherms's blood at 5:44 a.m. and 6:44 a.m. pursuant to the warrant. The blood sample taken at 6:44 a.m. produced a BAC of .093. The State's expert used this result and the BAC from the warrantless blood draw to opine that Vortherms's BAC was approximately .18 at the time of the accident.

2. The State charged alternative counts for driving under the influence under subsections (1) and (2) of SDCL 32-23-1: (1) when "[t]here is .08 percent or more by weight of alcohol in [a] person's blood," and (2) when a person is "[u]nder the influence of an alcoholic beverage . . . ." The State also charged

(continued . . .)

suppress the BAC result from the warrantless blood draw. He claimed the warrantless draw violated his Fourth Amendment rights because there were not exigent circumstances. Vortherms advanced that there were multiple officers at the scene of the accident and there was adequate time to obtain a telephonic warrant, which could have been obtained in as little as fifteen minutes.

[¶13.] Prior to trial, the circuit court held an evidentiary hearing on the suppression motion. The State offered Bumann's testimony and argued that there were exigent circumstances. Bumann testified that he and the other officers had not requested a warrant at the hotel because they were continuing to investigate the circumstances of the accident, including whether another person had been driving or was injured in the crash.

[¶14.] Bumann further testified that he did not believe he had time to obtain a warrant once he arrived at the hospital because he immediately learned that Vortherms would be admitted into surgery. Bumann knew that Vortherms's BAC would dissipate over time, and it could be altered by blood transfusions or medications that Vortherms might receive during surgery. He also believed that the hospital would not draw Vortherms's blood during surgery or delay the surgery until he got a warrant. Bumann acknowledged that it was possible to obtain a telephonic warrant in fifteen minutes, but he also knew from experience that it could take as long as an hour. He explained that the warrant process required him to prepare a narrative before phoning a judge to obtain approval. He also explained

---

(. . . continued)
　　Vortherms with reckless driving and speeding on the interstate, which the State dismissed before trial.

that he might have to call multiple judges before he reached a judge who answered the phone and could review the search warrant, especially in the early morning hours or on the weekend. Then, after the warrant was served, it could take an additional fifteen minutes to an hour for the hospital to find a phlebotomist to draw blood. The court held that exigent circumstances existed and denied the suppression motion.

[¶15.]   A trial was held from April 1-4, 2019, in Minnehaha County. The State presented evidence that Vortherms was driving under the influence of alcohol and caused the accident when he lost control of his pickup and drove into the Subaru's lane at approximately 95 miles per hour. The jury found Vortherms guilty on two counts of vehicular manslaughter, one count of vehicular battery, and one count of driving under the influence of alcohol.

[¶16.]   The court imposed a thirty-year prison sentence, with five years suspended, on the two vehicular manslaughter convictions; and suspended a ten-year prison sentence on the conviction for vehicular battery. The court imposed a suspended county jail sentence on the conviction for driving under the influence of alcohol with at least a .08 BAC.

[¶17.]   Vortherms appeals the circuit court's denial of his motion to suppress the warrantless blood draw and requests that this Court review his ineffective assistance of counsel claim on direct appeal.[3]

---

3.   Vortherms is represented by different counsel on appeal.

## Analysis and Decision

**1.** ***Whether the circuit court erred when it denied Vortherms's motion to suppress the warrantless blood draw.***

[¶18.] "We review the court's grant or denial of a motion to suppress involving an alleged violation of a constitutionally protected right under the de novo standard of review." *State v. Fischer*, 2016 S.D. 12, ¶ 10, 875 N.W.2d 40, 44. We review "[t]he court's findings of fact . . . under the clearly erroneous standard." *Id.* "Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo." *State v. Wright*, 2010 S.D. 91, ¶ 8, 791 N.W.2d 791, 794.

[¶19.] "The Fourth Amendment's prohibition against unreasonable searches and seizures requires generally the issuance of a warrant by a neutral judicial officer based on probable cause . . . . Warrantless searches are per se unreasonable, apart from a few, well-delineated exceptions." *Fischer*, 2016 S.D. 12, ¶ 13, 875 N.W.2d at 45. In *Missouri v. McNeely*, the Supreme Court reiterated that the Fourth Amendment requires law enforcement to obtain a warrant for a blood draw. 569 U.S. 141, 152, 133 S. Ct. 1552, 1561, 185 L. Ed. 2d 696 (2013) ("[W]here police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so.").

[¶20.] Exigent circumstances "is one of the well-delineated exceptions to the warrant requirement." *Fischer*, 2016 S.D. 12, ¶ 13, 875 N.W.2d at 45. It "applies when the exigencies of the situation make the needs of law enforcement so

compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'" *Id.* (quoting *McNeely*, 569 U.S. at 148-49, 133 S. Ct. at 1558). The State has the burden to prove this exception. *Id.* A court must "examine the totality of the circumstances to determine whether law enforcement faced exigent circumstances that justified the warrantless blood draw." *Id.* ¶ 17 (citing *McNeely*, 569 U.S. at 149, 133 S. Ct. at 1559).

[¶21.] Once Bumann arrived at the hospital, the court found that Vortherms's imminent surgery threatened to destroy BAC evidence. The court then analyzed whether Bumann's decision to obtain a warrantless blood draw at that point was reasonable under the circumstances. The court noted that officers were only at the hotel for approximately twenty minutes before an ambulance took Vortherms to the hospital. It reviewed Bumann's actions during this period: his assessment of Vortherms upon arriving at the hotel, his attention to Vortherms's injuries, and his interrogation of Vortherms in a developing DUI investigation. The court also considered the urgency of the situation based on Vortherms's injuries, his passage in and out of consciousness, and his statement that he was travelling with a "buddy" who appeared to be missing. The court rejected Vortherms's argument that the other responding officers could have obtained a warrant and delivered it to Bumann, noting that:

> Interstate 90 . . . is an extremely well-traveled interstate system[,] . . . [and] importantly, the other officers . . .were directed to search for a potential missing individual who could have either been dead or in need of immediate medical treatment. This information is based on defendant's own statements to law enforcement that he was traveling with someone.

Additionally, the court found that even if other officers could have obtained a warrant, "there certainly could have been [a] great distance between those troopers and [the hospital]," which would make it difficult for any officer to bring a warrant to Bumann.

[¶22.] Vortherms argues that the State failed to prove that exigent circumstances existed because there were multiple officers at the scene who could have begun the warrant application process soon after the accident was reported at 2:18 a.m. He further contends that it was possible for law enforcement in the Sioux Falls area to obtain telephonic warrants remotely in fifteen minutes. He reasons that these facts, along with Bumann's belief that Vortherms had been drinking shortly after Bumann arrived at 2:31 a.m., show that law enforcement had enough time to obtain a warrant before the warrantless blood draw.

[¶23.] We have held that imminent medical care that threatens to destroy BAC evidence through blood transfusions, intravenous fluids, or natural dissipation over time may create exigent circumstances. *Fischer*, 2016 S.D. 12, ¶ 20, 875 N.W.2d at 47-48. Therefore, Vortherms's argument primarily hinges on whether law enforcement's failure to obtain a warrant in the thirty-five minutes between Bumann's arrival at the hotel and his arrival at the hospital was unreasonable.[4]

---

4. Vortherms's appeal relies heavily on dash cam footage of Bumann's arrival at the hotel to support his claim that another officer at the scene could have obtained a warrant. This footage was admitted into evidence at trial, but it was not presented at the suppression hearing; and the circuit court was never asked to reexamine its ruling based on the dash cam footage. We decline to consider this footage in our review of the suppression motion because Vortherms did not present this evidence to the circuit court. *State v. Bowker*, 2008 S.D. 61, ¶ 35 n.4, 754 N.W.2d 56, 67 n.4 ("Since [the defendant] failed to

(continued . . .)

We do not review the reasonableness of an officer's conduct with the benefit of hindsight. Rather, we "ask whether police officers, under the facts as they knew them *at the time*, would reasonably have believed that delay in procuring a search warrant would gravely endanger life[ or] risk destruction of evidence." *State v. Hess*, 2004 S.D. 60, ¶ 25, 680 N.W.2d 314, 325 (emphasis added).

[¶24.] In *Fischer*, the defendant struck and killed two people with his vehicle near Pickstown, South Dakota. 2016 S.D. 12, ¶ 2, 875 N.W.2d at 42. The accident created an extensive debris field, which included the body parts of the victims. *Id.* ¶ 17. The Sheriff arrived at the scene approximately twenty minutes after deputies had arrived and after the defendant was taken away by ambulance. *Id.* ¶ 4. The Sheriff quickly learned that the defendant had smelled of alcohol and would be transported by helicopter to Sioux Falls for medical care, and he ordered a deputy to obtain a blood sample from the defendant before the defendant was transferred. *Id.* ¶ 5. The Sheriff did not tell the deputy to obtain a search warrant because he did not believe there was enough time. *Id.*

[¶25.] In *Fischer*, we determined that exigent circumstances existed because it was reasonable for the responding officers to continue their investigation of a fatal accident rather than stop the investigation to obtain a warrant. All available officers were still "busy directing the investigation, which included: helping those injured; preserving evidence from the rain by covering it; [and] preserving evidence

---

(. . . continued)

    introduce the [footage] at the hearing on the motion to suppress . . . or have it incorporated into those proceedings, any consideration of the content of the [footage] is waived on appeal."). Regardless, the footage does not refute Bumann's pretrial hearing testimony.

by photographing it . . ." when they learned that BAC evidence could be lost or destroyed by the defendant's transfer to Sioux Falls. *Id.* ¶ 9. We determined that law enforcement's failure to obtain a warrant in the first twenty-plus minutes on the scene was not unreasonable because the officers were busy investigating the accident and preserving evidence. *Id.* ¶ 20. *Fischer* also concluded that the warrantless blood draw was reasonable because the BAC evidence could be lost or destroyed by the time officers obtained a warrant. *Id.*

[¶26.] Similarly, only twenty-one minutes passed from the time that Bumann arrived at the hotel until Vortherms was transported to the hospital. During this time, Bumann verified Vortherms's identity, took photographs of Vortherms's injuries, and questioned Vortherms to determine his involvement in the accident and if others needed medical care. Bumann smelled alcohol on Vortherms's breath shortly after he arrived. However, because of Vortherms's condition, Bumann was unable to obtain a PBT until just before Vortherms was transported to the hospital. Additionally, Vortherms's own statements created pressing questions of whether Vortherms was driving or if another person was involved in the accident.

[¶27.] Further, it was not unreasonable for the other officers at the scene to assist Bumann and look for injured persons rather than prepare a warrant "under the facts as they knew them at the time[.]" *Hess*, 2004 S.D. 60, ¶ 25, 680 N.W.2d at 325. The circuit court noted that "Trooper Bumann's testimony clearly indicates that [it was] not possible" for another officer to obtain a warrant. The other officers were busy investigating the accident scene because they "didn't know if [other potential victims] were alive or not." Bumann also testified that he believed a

search was actively ongoing because he was informed that the Brandon Fire Department requested a helicopter to search for missing persons. The circuit court found that the investigation was even more urgent than in *Fischer*. We agree. Unlike *Fischer*, where multiple eyewitnesses immediately identified the driver and both victims, the officers here had to confirm—in the face of inaccurate information from Vortherms—who was involved in the accident and whether there were other survivors in need of medical treatment.

[¶28.] Moreover, delays "'in the regular course of law enforcement . . . from the warrant application process'" may be considered when determining whether exigent circumstances exist. *Fischer*, 2016 S.D. 12, ¶ 20, 875 N.W.2d at 47 (quoting *McNeely*, 569 U.S. at 156, 133 S. Ct. at 1563). "The metabolization of alcohol in the bloodstream and the ensuing loss of evidence are among the factors that must be considered in deciding whether a warrant is required." *Id.* ¶ 16 (quoting *McNeely*, 569 U.S. at 165, 133 S. Ct. at 1568). Further, "The relevant factors in determining whether a warrantless search is reasonable[] includ[e] the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence[.]" *McNeely*, 569 U.S. at 164, 133 S. Ct. at 1568. Exigent circumstances may exist despite technological advances that allow warrants to be obtained remotely. *McNeely*, 569 U.S. at 155, 133 S. Ct. at 1562 ("[I]mprovements in communications technology do not guarantee that a magistrate judge will be available when an officer needs a warrant after making a late-night arrest.").

[¶29.] Bumann testified that he knew it may take more than fifteen minutes to obtain a telephonic warrant because the accident occurred on an early weekend

morning. Bumann also testified about the logistical difficulty of finding another officer to help obtain a search warrant during an ongoing investigation. He explained that he would have to prepare a probable cause narrative for the warrant or convey the probable cause information to another officer. Then the other officer would need to drive to the hospital to serve the warrant. Bumann testified that it was unclear how long surgery would delay a blood draw, or if surgery would compromise the reliability of the BAC result. The circuit court found Bumann's testimony credible and that these facts created exigent circumstances. Here, we conclude that the urgency of medical treatment and its uncertain effects on BAC evidence fit well within the exigent circumstances recognized in *Fischer*.

### 2. *Whether Vortherms's ineffective assistance of counsel claim is cognizable on direct appeal.*

[¶30.] "Ineffective-assistance-of-counsel claims are generally not considered on direct appeal. Rather, such claims are best made by filing a petition for a writ of habeas corpus which, if granted, will result in an evidentiary hearing." *State v. Hauge*, 2019 S.D. 45, ¶ 18, 932 N.W.2d 165, 171. This is because the record on direct appeal typically does not afford a basis to review the performance of trial counsel. *See id.* Therefore, we have stated that "[a]bsent exceptional circumstances, we will not address an ineffective assistance claim on direct appeal. We depart from this principle only when trial counsel was so ineffective and counsel's representation so casual as to represent a manifest usurpation of the defendant's constitutional rights." *State v. Golliher-Weyer*, 2016 S.D. 10, ¶ 8, 875 N.W.2d 28, 31.

[¶31.]     Vortherms argues trial counsel made three errors that cumulatively created prejudicial error and should be reviewed on direct appeal: (1) failure to challenge the admissibility of the opinion of the State's accident reconstructionist prior to trial, (2) failure to challenge the admissibility of the "black box data" from Vortherms's vehicle, and (3) failure to call a witness who allegedly saw a Subaru swerve on I-90 around the time of the accident.

[¶32.]     Trial counsel for Vortherms presented an expert witness who responded to the opinion of the State's accident reconstructionist. Trial counsel also extensively cross-examined the State's accident reconstructionist and the State's witness on the "black box data." We can only speculate on this record whether trial counsel's approach to challenge the State's evidence in this fashion, rather than challenging its admissibility, was deficient. *State v. Phillips*, 2018 S.D. 2, ¶ 22, 906 N.W.2d 411, 417 (discussing how trial counsel's tactical decisions are not suited to review on direct appeal "because . . . trial counsel is not afforded the opportunity to explain and defend his or her actions"). Finally, a State Trooper testified that he interviewed the witness who had allegedly observed a Subaru weaving on I-90, but he determined that the witness could not identify the particular vehicle, its driver, and did not observe the accident. We cannot determine from this record whether this potential witness could have provided helpful information to Vortherms. *See State v. Beck*, 2010 S.D. 52, ¶ 24, 785 N.W.2d 288, 296 (rejecting an ineffective assistance of counsel claim when the defendant failed to establish prejudice). For these reasons, we decline to review Vortherms's ineffective assistance of counsel claim on direct appeal.

[¶33.]      We affirm.

[¶34.]      GILBERTSON, Chief Justice, and, KERN, SALTER, and DEVANEY,

Justices, concur.