#29318-a-MES
**2021 S.D. 16**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

   v.

JUDY K. SCHUMACHER,                          Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
FALL RIVER COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE ROBERT GUSINSKY
Judge

\* \* \* \*

JASON R. RAVNSBORG
Attorney General

BRIGID C. HOFFMAN
Assistant Attorney General
Pierre, South Dakota                          Attorneys for plaintiff and
                                             appellee.


JOHN M. FITZGERALD of
Fitzgerald Law Firm
Rapid City, South Dakota                      Attorneys for defendant and
                                             appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
JANUARY 11, 2021
OPINION FILED **03/03/21**

#29318

SALTER, Justice

[¶1.]		A jury convicted Judy Schumacher of two counts of aggravated assault under the theory that she used a deadly weapon in an attempt to put another in fear of imminent serious bodily harm.  The jury also found her guilty of one count of simple assault against a law enforcement officer.  Judy appeals, arguing she cannot be guilty of aggravated assault because the gun she was holding at the time of the incident giving rise to the charges was inoperable.  She also contends there was insufficient evidence to support the conviction of simple assault against a law enforcement officer.  She further claims that the facts supporting the simple assault charge should have been suppressed because they occurred following what she considers an unlawful entry onto her property to arrest her.  We affirm.

**Facts and Procedural History**

[¶2.]		On June 28, 2018, Fall River County Sheriff's Deputies Stephen Yenulonis and Kyle Maciejewski received a report of a domestic dispute between Judy Schumacher and her husband, Al.  The Schumachers live on an acreage near the community of Provo in Fall River County, but after the two argued at their home, a friend gave Judy a ride to nearby Edgemont and called for law enforcement assistance.

[¶3.]		Deputies Yenulonis and Maciejewski were dispatched to Edgemont where they spoke with Judy at her friend's house.  Judy reported that there had been no physical violence during the disagreement with Al and that they had quarreled about when it was best for Judy to seek medical care to address ongoing symptoms following a recent surgery.  The deputies advised Judy that they would,

nevertheless, need to visit with Al in order to complete their investigation. This prompted a strong response from Judy who became angry and began using profane language, telling the deputies in no uncertain terms that they should not attempt to speak with Al.

[¶4.] Undeterred, the deputies set out from Edgemont in separate patrol vehicles for the 10-minute drive to the Schumacher acreage near Provo. Still angry, Judy set out on foot toward her house before the deputies left Edgemont. When Deputy Maciejewski overtook her en route to Provo, he offered Judy a ride. She declined and responded defiantly, telling the deputy, "If you speak to my husband, I'm gonna kick your ass."

[¶5.] The deputies continued to the Schumacher acreage where they drove through an open gate to reach the house, but they were not successful in their effort to make contact with Al. After knocking on the front door and checking other areas around the house, they left. As the deputies drove away, Judy and Al passed by them in a vehicle driving the opposite direction toward the house.[1] The deputies turned around to return to the Schumachers' residence. When they arrived, the gate at the end of the driveway leading up to the house was closed and locked. Cameras in the patrol vehicles and the deputies' microphones recorded the ensuing sequence of events.

[¶6.] Waiting at the gate, the deputies could see Judy walking towards them down the driveway. Deputy Maciejewski realized that Judy was carrying a gun, which was later identified as a .22 caliber revolver. Judy held the revolver so that

---

1. At some point, Judy had telephoned Al and asked that he pick her up.

the barrel rested on her shoulder and the handle was pointing up in the air. The deputies immediately told her to put the revolver down, drew their own weapons, and took cover behind their vehicles. Judy ignored the deputies' orders to put the revolver down until she reached the gate. Once there, she brought the revolver forward off her shoulder in the general direction of the deputies, and placed it on top of a fence post, but ignored further instructions to step away from the revolver.

[¶7.] Al soon walked up behind Judy, and because Al had a calmer demeaner, Deputy Yenulonis asked him to take the revolver and move it away from Judy. Al complied and put the gun on a separate fence post away from Judy. Deputy Yenulonis then approached Al and retrieved the weapon. After the revolver had been secured,[2] both deputies climbed over the closed gate to place Judy under arrest for aggravated assault. As she was being handcuffed, Judy kicked Deputy Maciejewski and attempted to stomp on his foot.

[¶8.] It was later determined, and the parties agreed at trial, that the revolver "was incapable of discharging a projectile" at the time of the incident. Al testified that he had last fired the gun in 2002, and because of a loose barrel, small pieces of the lead bullet came back toward him and hit his arm.

[¶9.] The State charged Judy in what became a three-count information[3] which included two counts of aggravated assault, alleging that Judy assaulted each

---

2. Deputy Yenulonis initially placed the gun on the hood of a patrol vehicle. Despite some difficulty with the revolver's ejection pin, he eventually removed several live bullets with Al's assistance.

3. At the preliminary hearing, the State dismissed a fourth count alleging possession of a loaded firearm while intoxicated.

of the deputies by "attempt[ing] by physical menace with a deadly weapon" to put each of them "in fear of imminent serious bodily harm[.]" *See* SDCL 22-18-1.1(5).[4] Judy was also charged with simple assault against Deputy Maciejewski under the theory she had kicked him as he was attempting to arrest her. *See* SDCL 22-18-1(5), -1.05.

[¶10.]     Relying upon the condition of the gun, Judy filed a pretrial motion to dismiss the aggravated assault charges, arguing that the two counts contained in the information did not charge a public offense. In Judy's view, her conduct was not illegal because she could not "attempt by physical menace with a *deadly weapon* to put another in fear" if the revolver was inoperable.[5] (Emphasis added.) The circuit court was unpersuaded and denied her motion to dismiss.

[¶11.]     Judy also filed a motion to suppress prior to trial, seeking to exclude the facts related to the simple assault charge. She argued that the deputies violated her Fourth Amendment rights when they climbed over the gate to arrest

---

4.     The State did not charge Judy with aggravated assault of a law enforcement officer. *See* SDCL 22-18-1.05 (increasing the felony classification of aggravated assault under SDCL 22-18.1.1 from a Class 3 felony to a Class 2 felony when committed against a law enforcement officer engaged in the officer's duties).

5.     In their submissions on appeal, the parties describe the revolver as "inoperable" interchangeably with references to their pretrial stipulation, agreeing that the revolver was "incapable of discharging a projectile[.]" *See* SDCL 22-1-2(16) (defining firearm as "any weapon from which a projectile or projectiles may be discharged by gunpowder"). Al's testimony as related above, however, indicates that the revolver *did* fire when he last attempted it, but a loose barrel caused him to sustain minor injuries when shards of lead became embedded in his arm. We make no determination here whether a gun that could conceivably be fired, but not safely, satisfies the statutory definition of a firearm.

her in the driveway, and in her view, "any evidence gathered . . . from the moment after the deputies jumped the gate and entered the curtilage of the property" should be excluded as "fruit of the poisonous tree." The circuit court denied the motion after receiving testimony from Deputy Maciejewski and viewing the recorded audio and video evidence of the incident.[6]

[¶12.]       The case was tried to a jury on January 15 and 16, 2020. Though the .22 caliber revolver was damaged and could not be safely fired, the evidence established that Deputies Yenulonis and Maciejewski were unaware of the gun's condition. Both testified that Judy's actions caused them to fear for their lives because the revolver appeared to be a normal, working firearm as she walked toward them.

[¶13.]       Judy also testified at trial, but her testimony concerning the revolver proved problematic for her. She initially claimed she was merely carrying the revolver for protection from wild animals on her property. However, she also acknowledged that she knew the gun did not function properly. On cross-examination, the prosecutor pointed to the incongruity of possessing an inoperable firearm for protection against wild animals. When he suggested that Judy had instead armed herself in an attempt to frighten the deputies, Judy answered, "Fifth Amendment. I have the right to carry a firearm on my own property." The circuit court attempted to clarify whether Judy was attempting to invoke her Fifth

---

6.     Originally, Judy also moved to suppress the aggravated assault charges, arguing her Fourth Amendment rights were violated when the deputies simply drove to her property against her wishes. However, she ultimately abandoned this argument, and the circuit court did not consider it.

Amendment right to remain silent and allowed the prosecutor to repeat the question:

> Q:     [by the prosecutor]  I said the only reason to take the gun out at that point was to intimidate law enforcement. Correct?  And that's when you said, "I claim the Fifth"?
>
> A:     [by Judy]  No, that's not the only reason to take a firearm out.  I have the right to carry a firearm on my own property or in public according to state laws of South Dakota, Second Amendment of the United States Constitution.

[¶14.]     At the conclusion of the State's case, Judy moved for a judgment of acquittal on all three charges.  As to the aggravated assault charges, she argued that an inoperable firearm did not meet the definition of "deadly weapon," and for the simple assault charge, Judy claimed there was insufficient evidence that Deputy Maciejewski suffered any sort of injury during her arrest.  The circuit court denied the motion in all respects.

[¶15.]     As the circuit court and the parties settled final instructions, Judy proposed an instruction that included the statutory definition of "firearm:"

> "Firearm," any weapon from which a projectile or projectiles may be discharged by gunpowder.  As used in this subdivision, the term, gunpowder, includes any propellant that upon oxidization emits heat and light and is commonly used in firearms cartridges[.]

SDCL 22-1-2(16).

[¶16.]     Judy's position remained that the revolver was so damaged that it was no longer a firearm and could not, therefore, be used as a deadly weapon under SDCL 22-18-1.1(5).  The circuit court, however, denied the instruction along with efforts by Judy's counsel to argue to the jury that the non-working condition of the

revolver created a valid defense. The court relied, in part, on the breadth of the definition of "deadly weapon" which includes not only firearms but also any "device, instrument, material, or substance, whether animate or inanimate, which is calculated or designed to inflict death or serious bodily harm, or by the manner in which it is used is likely to inflict death or serious bodily harm[.]" SDCL 22-1-2(10).

[¶17.]    The jury returned a guilty verdict on all three counts. The court suspended concurrent ten-year prison sentences for each of the aggravated assault counts and a two-year sentence for the simple assault count. The court placed Judy on probation under conditions, including serving 90 days in jail.

[¶18.]    Judy appeals, raising several issues which we restate as follows:

1.    Whether the court erred by denying Judy's motion to suppress evidence of the simple assault charge.

2.    Whether the court erred by not instructing the jury on the definition of a firearm and by prohibiting Judy's argument regarding firearm operability.

3.    Whether the circuit court erred by denying Judy's motion for judgment of acquittal.

**Analysis and Decision**

*Motion to suppress evidence of the simple assault*

[¶19.]    "We review the circuit court's grant or denial of a motion to suppress involving an alleged violation of a constitutionally protected right under the de novo standard of review." *State v. Smith*, 2014 S.D. 50, ¶ 14, 851 N.W.2d 719, 723. "We review the court's findings of fact under the clearly erroneous standard. Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo." *State v. Vortherms*, 2020 S.D. 67, ¶ 18, 952 N.W.2d 113, 117 (internal quotations and citations omitted).

[¶20.] The Fourth Amendment's prohibition against unreasonable searches and seizures does not apply to areas in which a defendant has no reasonable expectation of privacy. *See State v. Jones*, 2017 S.D. 59, ¶ 15, 903 N.W.2d 101, 107 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.") (quoting *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 511, 19 L. Ed. 2d 576, 582 (1967)). Where it does apply, "[t]he Fourth Amendment's textual reference to the issuance of '[w]arrants' has been interpreted to state a general principle that police officers 'must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure[.]'"[7] *State v. Short Bull*, 2019 S.D. 28, ¶ 11, 928 N.W.2d 473, 476 (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968)).

[¶21.] "Despite this 'strong preference' for a warrant, certain exceptional warrantless searches and seizures are, nevertheless, reasonable." *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663, 134 L. Ed. 2d 911 (1996)). Included among them is the exigent circumstances exception which "will justify a warrantless entry into a home for the purpose of either arrest or search." *State v. Hess*, 2004 S.D. 60, ¶ 24, 680 N.W.2d 314, 325 (citing *Payton v. New York*, 445 U.S. 573, 590, 100 S. Ct. 1371, 1382, 63 L. Ed. 2d 639 (1980)). "Such

---

7. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

circumstances exist when there is an emergency: a situation demanding immediate attention with no time to obtain a warrant." *Id.*; *see also State v. Fischer*, 2016 S.D. 12, ¶ 13, 875 N.W.2d 40, 45 ("when the exigencies of the situation make the needs of law enforcement so compelling . . . a warrantless search is objectively reasonable under the Fourth Amendment") (quoting *Missouri v. McNeely*, 569 U.S. 141, 148-49, 133 S. Ct. 1552, 1558, 185 L. Ed. 2d 696 (2013)).

[¶22.] Here, the parties differ in their views about the reasonableness of Deputy Maciejewski's warrantless arrest on the Schumachers' property or whether the Fourth Amendment even applies given the conspicuous nature of Judy's conduct.[8] We think it is unnecessary to resolve these questions in this case, however.

[¶23.] Regardless of whether a law enforcement officer's arrest was illegal,[9] "assaultive conduct is not justifiable solely on the ground that the officers are violating the defendant's [F]ourth [A]mendment rights or on the ground that the defendant believes that the officers are violating his rights." *State v. Miskimins*, 435 N.W.2d 217, 221 (S.D. 1989) (quoting *State v. Wick*, 331 N.W.2d 769, 771 (Minn. 1983)). "[A] defendant who reacts to an arrest, even if it is unlawful, by committing a new and distinct criminal act may not seek the remedy of exclusion." *State v. Willingham*, 2019 S.D. 55, ¶ 27, 933 N.W.2d 619, 626.

---

8.  The State also cites SDCL 23A-3-2(1) as a statutory basis to support the arrest. *See* SDCL 23A-3-2(1) ("A law enforcement officer may, without a warrant, arrest a person . . . [f]or a public offense, other than a petty offense, committed or attempted in his presence[.]").

9.  We do not hold or suggest that Judy's arrest was unlawful.

[¶24.]    Here, Judy cannot "suppress" the evidence of her conduct giving rise to her simple assault charge.  Our settled decisional law prevents courts from excluding evidence of new criminal conduct resulting from a defendant's original arrest, even where the defendant alleges the arrest was unlawful.  "[T]o hold otherwise would allow a defendant carte blanche authority to go on whatever criminal rampage he [or she] desired and do so with virtual legal impunity as long as such actions stemmed from the chain of causation started by the police misconduct, be it minor or major."  *Id.* (quoting *Miskimins*, 435 N.W.2d at 221).  *See also United States v. Schmidt*, 403 F.3d 1009, 1016 (8th Cir. 2005) (holding resistance to an arrest, even an illegal one, can furnish a basis for a second, valid arrest, reasoning that "[a] contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to [an illegal arrest]").

### Jury Instruction and Firearm Operability

[¶25.]    "A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard."  *Vetter v. Cam Wal Elec. Co-op., Inc.*, 2006 S.D. 21, ¶ 10, 711 N.W.2d 612, 615.  However, "when the question is whether a jury was properly instructed overall, that issue becomes a question of law reviewable de novo.  Under this de novo standard, 'we construe jury instructions as a whole to learn if they provided a full and correct statement of the law.'"  *Id.*

[¶26.] "Any person who: [a]ttempts by physical menace with a deadly weapon to put another in fear of imminent serious bodily harm . . . is guilty of aggravated assault." SDCL 22-18-1.1(5). As indicated, the Legislature has defined "deadly weapon" as "any firearm, stun gun, knife, or device, instrument, material, or substance, whether animate or inanimate, which is calculated or designed to inflict death or serious bodily harm, or by the manner in which it is used is likely to inflict death or serious bodily harm[.]" SDCL 22-1-2(10). The general definition statute goes on to describe "[s]erious bodily injury" as "such injury as is grave and not trivial, and gives rise to apprehension of danger to life, health, or limb[.]" SDCL 22-1-2(44A).

[¶27.] The circuit court's instructions correctly stated these statutory principles and accurately expressed the controlling law relating to the aggravated assault charges. Judy's argument that South Dakota law allows her a defense because the revolver was inoperable is unsustainable.

[¶28.] As the circuit court observed, Judy's definition of "deadly weapon" is too narrow. Even if, as she argues, the inoperable .22 caliber revolver did not satisfy the statutory definition of a firearm, it nevertheless fits the portion of the "deadly weapon" definition which includes any "device, instrument, material, or substance, whether animate or inanimate, which is calculated or designed to inflict death or serious bodily harm[.]" SDCL 22-1-2(10). Without question, the design of a gun, such as the revolver here, is to inflict death or serious bodily harm.[10]

---

10. Judy also cites SDCL 22-14-17 to argue the inoperability of the gun precludes her charge of aggravated assault. The statute provides, "The provisions of

(continued . . .)

[¶29.]     Under the circumstances, the circuit court correctly refused to provide the statutory definition of firearm. The court also acted within its discretion to prohibit Judy's related effort to argue that she was not guilty of aggravated assault because the revolver was incapable of discharging a projectile. Simply put, telling the jury that the non-functioning revolver cannot be a deadly weapon would be a misstatement of the law, as the circuit court noted. *See Vetter*, 2006 S.D. 21, ¶ 10, 711 N.W.2d at 615 ("[N]o court has discretion to give incorrect, misleading, conflicting, or confusing instructions: to do so constitutes reversible error if it is shown not only that the instructions were erroneous, but also that they were prejudicial.").

[¶30.]     Although perhaps not directly controlling, we note that our holding here aligns with our earlier decision in *State v. Heumiller*, 317 N.W.2d 126 (S.D. 1982). In *Heumiller*, we considered a circumstance where the defendant pointed a shotgun at a deputy sheriff. Subsequent investigation revealed that the shotgun was not loaded, but the deputy was unaware of that fact and feared for his life. We described the aggravated assault theory listed in SDCL 22-18-1.1(5) in the following terms:

> SDCL 22-18-1.1(5) . . . must be viewed from the perspective of the victim. The gravamen of that offense is the fear it instills in

---

(. . . continued)

this chapter do not apply to any firearm which has been permanently altered so it is incapable of being discharged." SDCL 22-14-17. However, this statute has no applicability here because it exempts firearms that are incapable of being fired only from the provisions of SDCL chapter 22-14, dealing with the unlawful use of weapons. The State charged Judy with aggravated assault under a separate chapter, SDCL chapter 22-18, which concerns assaults and personal injuries.

> the mind of the victim who ordinarily does not know whether the firearm is in fact loaded. It is that unknown, however, which perpetrates the fear. Conversely if the victim knows the firearm is not loaded, then it is likely less than a deadly weapon. Absent that knowledge the victim must assume that a weapon, deadly by design, is in fact ready to dispense instant death. Subsequent knowledge that the firearm was not loaded does nothing to diminish the fear the victim experienced at the time of the assault. Consequently, in the absence of evidence that the victim knew the gun was unloaded, it is deemed loaded for the purposes of proving the element of fear and any evidence bearing in retrospect on whether it was loaded or unloaded is irrelevant.

*Id.* at 131.

[¶31.] We believe *Heumiller's* analysis regarding loaded versus unloaded weapons resembles in many respects the distinction Judy seeks to make between an operable gun and one that is inoperable by virtue of a latent defect or damage. Regardless of whether the gun in this case could be safely fired, the deputies believed it could be brought to bear upon them in an instant and were placed "in fear of imminent serious bodily harm[.]" SDCL 22-18-1.1(5).

**Motion for Acquittal**

[¶32.] We review the denial of a motion for acquittal de novo. *State v. Podzimek*, 2019 S.D. 43, ¶ 30, 932 N.W.2d 141, 149. Such a review requires the Court to "determine whether the evidence was sufficient to sustain the conviction." *Id.* In doing so, "we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* A guilty verdict will not be disturbed "[i]f the evidence, including circumstantial evidence and reasonable inferences drawn therefrom sustains a reasonable theory of guilt[.]" *Id.*

[¶33.] Here, Judy was charged with simple assault against a law enforcement officer. *See* SDCL 22-18-1.05. The jury was instructed, without objection, that "[a] person is guilty of simple assault . . . if the person: intentionally causes bodily injury to another which does not result in serious bodily injury." *See* SDCL 22-18-1(5). At the close of the State's case, Judy moved for a judgment of acquittal because Deputy Maciejewski did not have any physical injuries after she kicked him.[11] The court denied her motion.

[¶34.] On appeal, Judy continues to claim that she is not guilty because Deputy Maciejewski did not actually suffer any bodily injury. However, the recorded footage of the encounter shows otherwise. While Deputy Maciejewski is attempting to arrest Judy, she unmistakably kicks him which prompts him to immediately react by shouting, "ouch." From this evidence, we believe that the jury could reasonably conclude that the State met its burden to prove the injury element of the simple assault against a law enforcement officer charge.

[¶35.] We affirm.

[¶36.] JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.

---

11. Judy also moved for a judgment of acquittal for the aggravated assault charges based upon the claim that the revolver was inoperable and, therefore, not a firearm. She references the same theory in her appellate brief, but our analysis in the previous section disposes of any claim that Judy should have been acquitted on this basis.