#29884-a-MES
**2022 S.D. 66**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

ROBERTO CARLOS ALVAREZ,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE ROBERT L. SPEARS
Judge

\* \* \* \*

TIMOTHY J. CUMMINGS of
Green Roby Oviatt, LLP
Watertown, South Dakota                    Attorneys for defendant
                                      and appellant.

MARK VARGO
Attorney General

STEPHEN G. GEMAR
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                      and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
AUGUST 30, 2022
OPINION FILED **11/02/22**

#29884

SALTER, Justice

[¶1.] Roberto Alvarez pled guilty to one count of first-degree rape in violation of SDCL 22-22-1(1), which punishes sexual penetration of a victim less than thirteen years of age. After a change of plea hearing but prior to sentencing, Alvarez filed a letter with the circuit court asking to withdraw his guilty plea and requesting substitute counsel. The court denied both requests and sentenced him to 100 years in prison with fifteen years suspended. Alvarez appeals the court's decision to deny his request to withdraw his guilty plea and alleges his trial counsel rendered ineffective assistance. We affirm.

## Facts and Procedural History

[¶2.] Roberto Alvarez lived in Fargo, North Dakota, and became romantically involved with Nicole Lavallie of Watertown, South Dakota. Alvarez accepted Lavallie's invitation to move to Watertown and stay with her and her two children from a previous relationship. Lavallie soon became pregnant with Alvarez's child and gave birth to their daughter in October 2018.

[¶3.] The couple's relationship was strained. According to Alvarez, the two regularly used illicit drugs, including marijuana and methamphetamine, which often led to bitter disputes. At various times, Alvarez contemplated moving back to Fargo, but he claimed Lavallie threatened to harm herself if he left her alone to care for the children, so he remained in Watertown.

[¶4.] On January 14, 2020, Lavallie asked Alvarez to pick the children up from school and daycare and watch them until she was able to return home from an appointment in Sioux Falls. After dropping the children off at home, Alvarez told

-1-

the two older children that he intended to drive to a local gas station to get something to eat. Lavallie's five-year-old daughter, F.E., asked if she could go along. Alvarez agreed, and the two departed for the gas station.

[¶5.] High on phenylcyclohexyl piperidine (PCP), Alvarez drove to the gas station in his pickup. Once in the parking lot, Alvarez undressed F.E. from the waist down. He then removed his own pants and, according to F.E., began raping her. F.E. also reported that Alvarez choked her during the attack and told her to tell him "I love you" though she explained it was hard to talk while she was being choked.

[¶6.] At some point, another vehicle entered the parking lot and parked next to Alvarez. Alvarez told F.E. to conceal herself on the floor of the pickup until the driver of the vehicle was out of sight. He then drove to a nearby residential neighborhood where he again stopped his vehicle. Still in a partial state of undress, Alvarez forced F.E. into the bed of his pickup, which was concealed by a topper. There, F.E. stated, he raped her a second time.

[¶7.] Not long after they had left, Alvarez returned home with F.E. and told her not to say anything about what happened in the pickup. When they entered the house, F.E.'s older sister noticed bruising around her neck. Suspecting something was seriously wrong, F.E.'s sister took her to the basement, out of sight of Alvarez, and asked her what had happened. F.E. revealed only that Alvarez had put his arms around her neck and choked her. Her sister then notified Lavallie, who immediately contacted law enforcement.

[¶8.] Officers arrived at the house and spoke with F.E., who disclosed that Alvarez had sexually assaulted her. By that time, Alvarez had fled the home on foot. F.E. was taken to an emergency room in Sioux Falls where medical personnel performed a sexual assault examination. Swabs taken from F.E.'s ears and neck later revealed the presence of DNA that matched samples obtained from Alvarez, but an analysis of vaginal and anal swabs produced inconclusive results.

[¶9.] F.E. was later interviewed by specialists at Child's Voice in Sioux Falls. She claimed that two separate assaults had occurred and that Alvarez was the sole perpetrator. F.E. also accurately recalled items of physical evidence obtained from a search of Alvarez's vehicle, and she narrated the sequence of events in detail. F.E.'s statements indicated that both vaginal and anal penetration had occurred during the assaults.

[¶10.] Alvarez was arrested and indicted on two counts of first-degree rape,[1] *see* SDCL 22-22-1(1) (sexual penetration of a victim less than thirteen years of age), and one count of aggravated assault, *see* SDCL 22-18-1.1(8) ("[a]ttempt[ ] to induce a fear of death or imminent serious bodily harm by impeding the normal breathing or circulation of the blood of another person by applying pressure on the throat or neck, or by blocking the nose and mouth"). First-degree rape is a Class C felony, punishable by up to life in prison, *see* SDCL 22-6-1(3), and carries a mandatory minimum sentence of fifteen years, *see* SDCL 22-22-1.2(1). Alvarez pled not guilty and was provided court-appointed counsel.

---

1. Count one related to the assault at the gas station and count two related to the second assault in the bed of Alvarez's pickup.

[¶11.]     The parties eventually negotiated a plea agreement under which Alvarez agreed to plead guilty to one count of first-degree rape.  The State, for its part, agreed to dismiss the remaining charges in the indictment and also agreed not to file two additional charges relating to Alvarez's conduct while in pretrial custody.  The agreement, which the parties reduced to writing, did not purport to limit the circuit court's sentencing discretion.

[¶12.]     Alvarez signed the plea agreement as well as a document titled "Acknowledgement of Rights and Facts and Circumstances."  The acknowledgement included a recital of Alvarez's constitutional and statutory rights and listed the elements of first-degree rape.  Included among them was the element requiring an act of sexual penetration.  The final paragraph of the acknowledgement was drafted as a first-person statement by Alvarez, and stated that "[t]o obtain the benefit of the bargain, I admit . . . [that] I did engage in an act of sexual penetration with F.E."

[¶13.]     The circuit court conducted a change of plea hearing and advised Alvarez that he would be waiving his constitutional and statutory rights by pleading guilty.  Alvarez acknowledged these rights and agreed that he had authorized his attorney to negotiate the plea agreement on his behalf and was satisfied with his attorney's efforts.  Alvarez confirmed that he had read the entire plea agreement, desired to plead guilty and was aware of the potential maximum penalty and the mandatory minimum sentence of fifteen years.[2]

---

2.    The court specifically asked Alvarez, "Would you tell me what is the maximum authorized punishment for [the first-degree rape] charge, if I accept your plea of guilty to that charge, and then at the sentencing hearing sentence you to the maximum prescribed by law?"  Alvarez answered, "For

(continued . . .)

[¶14.]     The State offered the following factual basis for Alvarez's plea, which was followed by a colloquy between Alvarez and the circuit court:

> [Attorney for the State]: On or about January 14 of 2020, the defendant lived in the home with F.E. . . . [who] was [ ] 5 [years old] on that date.  That day he took her to the convenience store.  He parked the car.  During Child's Voice Interview, F.E. disclosed that the defendant put his penis in her vagina while the car was parked behind the Casey's gas station.
>
> [The court]: Mr. Alvarez, did you hear what the State's attorney told me about the facts of your case?
>
> [Alvarez]: Correct, Your Honor.  Yes.
>
> [The court]: Is there anything in those facts that you would disagree with?
>
> [Alvarez]: No, Your Honor.
>
> [The court]: Are those facts the truth?
>
> [Alvarez]: Yes.

[¶15.]     After this exchange, Alvarez's attorney interjected to note "that the plea [ ] agreement itself recites benefit of the bargain as part of the consideration as well."  The court stated that "I understand that, but I think the facts here now are pretty clear as well."  The court accepted Alvarez's guilty plea, finding the factual basis supported the plea and that Alvarez had entered it knowingly and voluntarily. It then ordered a presentence investigation (PSI) and a psychosexual evaluation and scheduled the matter for sentencing.

---

(. . . continued)
        life."  When asked whether he knew if there was a mandatory minimum sentence associated with the charge, Alvarez responded, "Fifteen years."

[¶16.]    As part of the PSI, Alvarez related that he was born in Texas to parents of Mexican descent and primarily spoke Spanish. He discontinued school in 9th grade and worked largely as a migrant farm worker, eventually making his way to North Dakota. He was not involved in the lives of any of his four children from previous relationships, and he reported that he regularly abused drugs and alcohol. In recalling the events of January 14, 2020, Alvarez wrote the following statement: "I rubed my self on F.E. in a sextul way by her her sit on top of me with no pats on. I may have no penetrated her but still it was a very shamful way of acting[.]"[3]

[¶17.]    The PSI was conducted on September 10, 2021. Three days prior, on September 7, a letter from Alvarez addressed to the clerk of courts was filed with the circuit court. In the letter, Alvarez requested a different attorney, claiming his court-appointed counsel had misled him about aspects of his plea agreement and only visited him twice during his seventeen months of pretrial custody. Alvarez also asked to withdraw his guilty plea, though he did not claim innocence as a basis.

[¶18.]    At the sentencing hearing, the circuit court questioned Alvarez about the letter. Alvarez alleged that his attorney had previously told him "the plea was for . . . 10 years, serve five. And then when we came here, he explained that it was a whole different thing." When asked to elaborate on why he thought he would only be required to serve five years, Alvarez stated, "I was arguing there was no penetration or none of that. And he didn't even give me the time to explain to

---

3.    To assist with our description of Alvarez's principal arguments, we have restated his statement from the PSI in its original form.

him. . . . [W]hen he explained to me about the deal, he didn't say nothing like the way [the court] explained it."

[¶19.] The circuit court reminded Alvarez that he had previously agreed that he understood the nature and severity of the charges, the potential maximum sentence, and "went ahead and entered a guilty plea[.]" Alvarez again claimed, as he had in his letter, that his attorney had failed to adequately explain the terms of the plea agreement. The court reiterated that it had previously asked Alvarez whether he was satisfied with the plea agreement, and at that time, Alvarez said he was. Alvarez claimed he did not remember this line of questioning, that he had signed the plea agreement without reading it, and that he was simply wrong when he told the court that he understood the nature and severity of the charges. The court denied Alvarez's request to withdraw his guilty plea, stating, "I find Mr. Alvarez's comments to be non-credible, and nothing more than a delaying tactic in this very serious criminal file."

[¶20.] The circuit court continued with the sentencing and asked Alvarez whether he had read the PSI. Alvarez stated that his attorney had shown it to him but that he had not read it because he has "a hard time reading English[.]" The court, the State, and Alvarez's attorney all agreed that this was the first time Alvarez had voiced concerns about his inability to understand written English and also that he had not, in the case's seventeen-month pendency, requested translation of documents written in English. Alvarez's attorney explained that he had reviewed the PSI with him for over an hour prior to the hearing, and Alvarez did not ask any questions about its contents.

[¶21.] In its sentencing argument, the State asked the circuit court to impose a life sentence. For his part, Alvarez's attorney addressed his client's belated assertion of innocence, stating, "[M]y client denies any penetration took place . . . . [H]e acknowledges that there was some sexual contact, but he denies penetration. He also denies strangling the victim." Alvarez's attorney also noted that the plea agreement contained language referencing the "benefit of the bargain."[4]

[¶22.] The circuit court again examined Alvarez about his denial, this time placing him under oath. However, Alvarez did not use this opportunity to deny the facts of his guilty plea. Instead, he offered a general expression of regret and attributed his actions to the influence of drugs.

[¶23.] The court sentenced Alvarez to 100 years in prison with fifteen years suspended and credit for time served. Alvarez appeals, claiming the court abused its discretion when it denied his request to withdraw his guilty plea. He also alleges that his court-appointed counsel was ineffective.

---

4. The record contains several references to the "benefit of the bargain," but it appears it was initially offered simply as an explanation of Alvarez's motivation to enter into the plea agreement (i.e. to obtain the dismissal of the other rape charge and the aggravated assault charge)—not as a reference to an *Alford*-style plea in which a defendant pleads guilty to obtain the benefit of a plea agreement while simultaneously maintaining his innocence. *See State v. Clegg*, 2001 S.D. 128, ¶ 2, 635 N.W.2d 578, 579 (explaining a benefit of the bargain plea and relating the practice to the plea procedure set out in *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970)). Indeed, Alvarez did not assert innocence at the change of plea hearing and agreed that all of the elements of first-degree rape were established, including penetration. The idea that the circuit court could sentence Alvarez despite his later claim that there had been no penetration arose later at the sentencing hearing.

**Analysis and Decision**

*Withdrawing a Guilty Plea*

[¶24.] A circuit court's decision to grant or deny a motion to withdraw a guilty plea is reviewed under our abuse of discretion standard. *State v. Kvasnicka*, 2016 S.D. 2, ¶ 7, 873 N.W.2d 705, 708. "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Id.* (citation and internal quotation marks omitted).

[¶25.] The provisions of SDCL 23A-27-11 authorize a motion to withdraw a guilty plea "before sentence is imposed or imposition of sentence is suspended[.]"[5] However, a defendant's right to seek relief under SDCL 23A-27-11 should not be equated with "an automatic right" to withdraw his previously entered guilty plea. *State v. Ceplecha*, 2020 S.D. 11, ¶ 39, 940 N.W.2d 682, 694 (quoting *Kvasnicka*, 2016 S.D. 2, ¶ 8, 873 N.W.2d at 708). Rather, to prevail on the motion, the defendant "must show a 'fair and just' reason for withdrawing a guilty plea." *Id.* (quoting *United States v. Hyde*, 520 U.S. 670, 671, 117 S. Ct. 1630, 1631, 137 L. Ed. 2d 935 (1997)).[6] "[B]ecause a defendant no longer enjoys the presumption of innocence

---

5. We note that Alvarez's attorney did not file an actual motion to withdraw the plea on Alvarez's behalf; the parties and the circuit court treated Alvarez's letter as a motion seeking that relief.

6. Where, as here, the motion is made prior to sentencing, "a court should exercise its discretion liberally in favor of withdrawal." *Ceplecha*, 2020 S.D. 11, ¶ 38, 940 N.W.2d at 694 (quoting *Kvasnicka*, 2016 S.D. 2, ¶ 8, 873 N.W.2d at 708). A more stringent standard applies to requests to withdraw a guilty plea after sentencing. *See* SDCL 23A-27-11 (stating a court may permit a

(continued . . .)

after pleading guilty, the defendant bears the burden of production and persuasion" to justify a decision allowing him to withdraw his guilty plea. *Id.* ¶ 41, 940 N.W.2d at 694.

[¶26.] Analyzing whether a defendant's reasons for withdrawal are fair and just "implicates a number of non-exclusive considerations[.]" *Id.* ¶ 40, 940 N.W.2d at 694. These include:

> whether the defendant knowingly and voluntarily pleaded guilty; whether the defendant asserts [he] is innocent; delay between the defendant's plea and request for withdrawal of the plea; whether the defendant received competent assistance of counsel in making the decision to plead guilty; whether withdrawing the plea will prejudice the prosecution of the defendant; and whether withdrawing the plea will waste judicial resources[.]

*Id.* (alterations in original) (quoting *Kvasnicka*, 2016 S.D. 2, ¶ 9, 873 N.W.2d at 709); *see also State v. Thielsen*, 2004 S.D. 17, ¶ 17, 675 N.W.2d 429, 433 (citation omitted) (examining the factors listed above, including whether the defendant "misapprehended the facts").

[¶27.] We have previously held that "[s]elf-serving testimony in which a defendant proclaims his innocence is not a persuasive basis for allowing a defendant to withdraw his guilty plea." *Ceplecha*, 2020 S.D. 11, ¶ 53, 940 N.W.2d at 697. This is especially true when, in the absence of "a compelling explanation[,]" the defendant makes a belated challenge to the factual basis for the plea. *See Kvasnicka*, 2016 S.D. 2, ¶ 13, 873 N.W.2d at 710 (quoting *United States v. Peterson*,

---

(. . . continued)
defendant to withdraw his plea after sentencing "to correct manifest injustice").

414 F.3d 825, 827 (7th Cir. 2005) ("[A] motion that can succeed only if the defendant committed perjury at the plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction.")).

[¶28.] Here, Alvarez raises two grounds upon which he believes the circuit court should have granted his motion to withdraw his plea. The first is his assertion of innocence, or at least a claim that he did not commit first-degree rape. Alvarez referenced this claim through his statement in the PSI—approximately five months after the change of plea hearing—where he claimed he "may not" have penetrated F.E. in the course of sexually assaulting her.[7] He raised the argument again at his sentencing hearing, claiming he tried unsuccessfully to tell his attorney that no sexual penetration took place. But these allegations are inconsistent with the multiple instances in which Alvarez agreed that the opposite was true.

[¶29.] At the change of plea hearing, the State's factual basis for count one specifically addressed the element of sexual penetration. Alvarez stated he had no disagreement with the factual basis statement narrated by the prosecutor and that the facts, which included the element of penetration, were true. Alvarez's letter to the circuit court also did not allege his innocence but rather indicated general displeasure with what he perceived as a lack of communication from his attorney. When asked under oath to give a statement to the court prior to sentencing, Alvarez

---

7. Sexual penetration is statutorily defined as "an act, however slight, of sexual intercourse, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the body or of any object into the genital or anal openings of another person's body." SDCL 22-22-2. It is unclear from the record whether Alvarez is contemplating this precise legal definition or a different, potentially narrower meaning of the term.

did not assert his innocence and, instead, alleged only that his use of illicit drugs had caused him to act in an uncharacteristically heinous way. Finally, the plea agreement and the acknowledgement of rights, both of which Alvarez signed, also included express references to the element of penetration.

[¶30.] Alvarez's more recent claim that no sexual penetration took place is inconsistent with all of his previous acknowledgements and communications with the court, the terms of the signed plea agreement itself, and his statements at the change of plea hearing. This type of generalized denial, unconnected to any evidentiary basis in the record, is not adequate to meet his burden under SDCL 23A-27-11. Rather, it is the sort of "[s]elf-serving testimony" that is generally considered insufficient to allow a defendant to withdraw a plea of guilty. *See Ceplecha*, 2020 S.D. 11, ¶ 53, 940 N.W.2d at 697. Moreover, the contradictory nature of his statements puts the court in the precarious position of accepting an admission of perjury, alone, as a basis for withdrawal—something we have justifiably decried. *See Kvasnicka*, 2016 S.D. 2, ¶ 18, 873 N.W.2d at 713 ("Lying to a plea-taking court does not support a fair and just reason for later withdrawing a guilty plea[.]"). Therefore, we conclude the court did not abuse its discretion in denying Alvarez's motion despite his post-plea claim he did not penetrate F.E. while he was sexually assaulting her.

[¶31.] Alvarez also asserts that his inability to read English at a proficient level prevented him from understanding the plea agreement and led to his misapprehension of the facts. *See Thielsen*, 2004 S.D. 17, ¶ 17, 675 N.W.2d at 433 (listing misapprehension of facts among a series of factors a court may consider

when determining a motion to withdraw a guilty plea). But this argument similarly contradicts Alvarez's testimony at the change of plea hearing. There, Alvarez confirmed that he had read the one-and-a-half-page agreement in its entirety prior to signing it. The State then offered the factual basis for the plea—which included an unambiguous reference to the element of sexual penetration—and Alvarez agreed that it was an accurate description of the events of January 14, 2020.

[¶32.] Whether and to what extent Alvarez struggles with reading English are questions we are unable to resolve.[8] But even if we accept that Alvarez has some level of impediment in this regard, the record at this point does not reveal an objective indication that he misunderstood the plea agreement, the facts of his case, or the potential range of penalties. *See People v. Mehmedoski*, 565 N.E.2d 735, 739 (Ill. App. Ct. 1990) (rejecting inmate's post-conviction challenge to his guilty plea because "[t]he trial court was in the best position to determine defendant's ability to understand and communicate in English and to understand the proceedings").

[¶33.] At the change of plea hearing, the circuit court canvassed Alvarez about whether he had read the plea agreement prior to signing it, and Alvarez told the court he had. Alvarez also demonstrated his familiarity with the potential maximum penalty he faced as well as the mandatory minimum sentence by accurately stating both in response to the court's inquiries. And when the State

---

8. Alvarez's written responses included in the PSI suggest something less than complete proficiency in written English, but the psychosexual evaluation states that Alvarez "spoke, wrote, and read English fluently enough to proceed without an interpreter." The evaluator did not, however, administer an English-language IQ test after determining Alvarez would be an inappropriate candidate for that exam.

recited the factual basis statement—which included a direct reference to vaginal penetration—Alvarez unequivocally agreed that the statement was accurate. Under the circumstances, the circuit court did not abuse its discretion in denying Alvarez's motion on the basis that he could not understand the plea agreement.[9]

*Ineffective Assistance of Counsel*

[¶34.]    "[A]bsent exceptional circumstances, we will not address an ineffective assistance claim on direct appeal." *State v. Vortherms*, 2020 S.D. 67, ¶ 30, 952 N.W.2d 113, 120–21 (quoting *State v. Golliher-Weyer*, 2016 S.D. 10, ¶ 8, 875 N.W.2d 28, 31). The rule is a practical one, necessitated by the fact that "the record on direct appeal typically does not afford a basis to review the performance of trial counsel." *Id.* ¶ 30, 952 N.W.2d at 120; *see also State v. Thomas*, 2011 S.D. 15, ¶ 23, 796 N.W.2d 706, 714 ("The reason is to allow attorneys charged with ineffectiveness to explain or defend their actions and strategies, and thus a more complete picture of what occurred is available for review." (cleaned up)).

[¶35.]    "[O]nly when trial counsel was so ineffective and counsel's representation so casual as to represent a manifest usurpation of the defendant's constitutional rights" will we attempt to resolve his claim on direct appeal. *Vortherms*, 2020 S.D. 67, ¶ 30, 952 N.W.2d 113, 121 (citation omitted). Where this standard is not met, the better course is to consider a defendant's Sixth Amendment

---

9.    Additionally, Alvarez did not argue a lack of written English proficiency as a basis for withdrawing his guilty plea at the sentencing hearing, though he did mention it in response to the circuit court's inquiry into whether he had read the PSI.

ineffective assistance claim within the context of a habeas corpus action where the parties may develop the factual record. *Id.* ¶ 30, 952 N.W.2d at 120.

[¶36.]     Alvarez attributes several errors to his court-appointed counsel that, he claims, entitle him to relief at this stage. Among them are factual allegations claiming a lack of visits to Alvarez while he was incarcerated; failing to ask if Alvarez understood the plea agreement; explaining to him that he would only serve five years in prison; and encouraging Alvarez to sign the plea agreement despite the assertion of his innocence. However, we cannot determine, under the current state of the record, the accuracy of these claims and, consequently, whether defense counsel's performance was so patently ineffective under the standard set out above so as to support review of Alvarez's claims now. We, therefore, decline to address Alvarez's claim of ineffective assistance of counsel on direct review.

[¶37.]     We affirm.

[¶38.]     JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.