#29644-a-MES
**2023 S.D. 6**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                        Plaintiff and Appellee,

    v.

LEE TODD MALCOLM,                        Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE CARMEN MEANS
Judge

\* \* \* \*

SCOTT R. BRATLAND
Watertown, South Dakota                        Attorney for defendant and
                                               appellant.


MARTY J. JACKLEY
Attorney General

CHELSEA WENZEL
JENNY JORGENSON
Assistant Attorneys General
Pierre, South Dakota                           Attorneys for plaintiff and
                                               appellee.

\* \* \* \*

ARGUED
OCTOBER 5, 2022
OPINION FILED **01/25/23**

#29644

SALTER, Justice

[¶1.]     Lee Malcolm was convicted of nine counts of third-degree rape involving J.C. in violation of SDCL 22-22-1(4).  Malcolm's defense theory was that J.C. gave "advance consent" to the instances of sexual penetration before she passed out and became incapable of giving contemporaneous consent.  The circuit court rejected the legal basis of the defense and, as a consequence, excluded evidence that J.C. gave advance consent, including Malcolm's testimony and evidence of the prior sexual history between Malcolm and J.C.  After the jury's verdict, the court sentenced him to 50 years in prison with fifteen years suspended.

[¶2.]     Malcolm now appeals, challenging the court's decision regarding the advance consent theory and the corresponding exclusion of evidence.  Malcolm also argues the court's jury instructions were inadequate and asks that we consider the merits of his ineffective assistance of counsel claim in this direct appeal.  We affirm the circuit court and leave Malcolm's ineffective assistance claims for further development should he pursue a habeas corpus action.

### Factual and Procedural Background

[¶3.]     Following several intermittent periods of dating, Malcolm and J.C. started living together in the summer of 2019.  The two lived with Malcolm's mother in her Watertown home.

[¶4.]     At around 4:30 p.m. on October 27, 2019, Malcolm and J.C. went to Walmart to fill J.C.'s prescription of Baclofen, which is a muscle relaxer.  Malcolm stated that they purchased a six pack of beer and two single shots of vodka before returning to their house.  After consuming the alcohol, they drove to a Watertown

-1-

bar where they drank more beer and liquor until approximately 1:00 a.m. the following morning. Prior to returning home, J.C. drove them to a different Watertown bar where they each drank several double-shot mixed drinks and purchased four more double-shot mixed drinks to-go.

[¶5.] The pair finished their drinks in the backyard when they returned home and then went to their upstairs bedroom where they engaged in sex. Malcolm then ate a bowl of chili, smoked a cigarette, and fell asleep in their bed.

[¶6.] According to Malcolm, he was shortly thereafter awakened by a panicked J.C. who was expressing displeasure with him for not paying "enough attention to her." Malcolm claims he tried to "reassure" her that she was all he thought about, but J.C. started packing a bag and indicated that she was going to leave the house. J.C. went outside for about fifteen minutes before coming back into the house after she had "calmed down," by Malcolm's assessment. J.C. and Malcolm then went back to their bedroom to lie in bed and watch television, and Malcolm fell back to sleep.

[¶7.] Later, Malcolm claims he woke up after something struck him above his left eye. He noticed J.C. was not in bed and discovered her face down on the floor beside the bed bleeding from her head. Malcolm helped J.C. off the floor and she went to the bathroom to attend to her wound. After J.C. bandaged the cut, they both laid back down on the bed, and Malcolm resumed sleeping.

[¶8.] Allegedly still upset with Malcolm for not paying enough attention to her, J.C. woke Malcolm up again. Malcolm later claimed that he asked J.C. what she wanted him to do, and she replied, "I want you to make love to me." Malcolm

then left the bedroom to take a shower, apparently to prepare for a second sexual encounter.

[¶9.] When he returned to the bedroom, Malcolm used a cell phone to take several video recordings of himself performing sexual acts on an unresponsive J.C. Throughout these videotaped sexual acts, J.C. frequently snored and did not open her eyes, speak any words, or change her positioning, aside from occasional groans and movements that a physician later described as involuntary responses to stimuli. The video recordings reveal that Malcolm inserted foreign objects into J.C.'s vagina and anus. Malcolm also sexually penetrated J.C.'s mouth, vagina, and anus with his fingers, his fist, and his penis.

[¶10.] Malcolm ended this series of sex acts with J.C. after approximately two hours and then went back to sleep. He eventually woke up later in the afternoon and noticed J.C. was cold to the touch and unresponsive. Malcolm called 911 for emergency assistance, prompting a quick response by police officers and emergency medical technicians who arrived and treated J.C. Unfortunately, efforts to revive J.C. were not successful, and she passed away later that day at a local hospital.

[¶11.] As part of their investigation of J.C.'s death, police officers obtained a search warrant, which they executed at Malcolm's home that same day. During the investigation, an empty pill bottle bearing a Baclofen label was recovered, which, Malcolm reported, had contained the Baclofen they had picked up at Walmart the previous day. Toxicology testing, ordered as part of an autopsy, ultimately revealed J.C. died of a fatal combination of Baclofen and Hydroxyzine toxicity, an apparent overdose for which police officers determined Malcolm was not responsible.

[¶12.]       However, the investigation into J.C.'s death took on a new dimension after officers discovered and reviewed the self-recorded videos of Malcolm performing acts of sexual penetration upon a seemingly unconscious J.C. Malcolm was arrested on October 31, 2019, and charged with third-degree rape. The case was dismissed on November 15, 2019, and recharged on January 13, 2020.

[¶13.]       On that date, a Codington County grand jury returned an indictment charging Malcolm with five counts of third-degree rape under alternative theories: 1) J.C. was either incapable of consenting to the sexual penetration by virtue of physical or mental incapacity; or 2) she was incapable of consenting "because of any intoxicating, narcotic, or anesthetic agent or hypnosis[.]" SDCL 22-22-1(3), (4). The State later obtained a superseding indictment alleging nine counts of third-degree rape under the same alternate theories. Malcolm pled not guilty and was represented by appointed counsel.

[¶14.]       Shortly before trial, the State moved in limine to exclude evidence of prior sexual activity between Malcolm and J.C. The State argued that the disclosure deadline under the rape shield statute set out in SDCL 19-19-412 (Rule 412) had passed without an effort by Malcolm to seek admission of prior sexual conduct evidence involving J.C. The State also contended that any such evidence would be inadmissible, in any event, under both Rule 412 and the more general relevancy provisions of SDCL 19-19-403 (Rule 403).

[¶15.]       During a hearing conducted five days before trial, the prosecutor stated she had filed the motion in limine based upon the belief that Malcolm intended to offer specific instances of his prior sexual conduct with J.C. in an

attempt to present a consent defense. Notwithstanding Malcolm's noncompliance with the notice requirements of Rule 412,[1] the prosecutor explained that "[t]he State preemptively filed the motion to quash such evidence." *See* SDCL 19-19-412(c)(1)(A), (B) (requiring a party seeking to offer evidence of specific instances of a victim's sexual behavior to "[f]ile a motion that specifically describes the evidence . . . at least 14 days before trial unless the court, for good cause, sets a different time").

[¶16.]     The circuit court acknowledged the State's argument and observed that the defense had not "give[n] me what I need to know to decide this issue." In response to the court's direct question asking "who are your [Rule 412] witnesses and what are they testifying to[,]" defense counsel expressed uncertainty but indicated "there are going to be witnesses." Defense counsel asked the court to "reserve ruling" on the State's motion in limine, arguing that "the seriousness of the allegations" justified invoking the good cause provision of Rule 412(c)(1)(B)'s notice requirement. But the court was unable to find a basis for good cause to excuse the 14-day notice provision of Rule 412 and stated:

> The idea that [the defense] do[es]n't have to give notice to the
> State as required by statute in a serious case is not an argument
> the [c]ourt is going to entertain . . . . As you sit here today, 5
> days before trial, you're not able to tell me who your witnesses
> are and what they are going to say. I can't conduct a meaningful
> hearing and I am not going to give you free reign [sic] to walk in

---

1.    In addition to the recorded videos depicting the acts of sexual penetration Malcolm performed on J.C. while she was unresponsive on October 28, the record suggests that police officers also recovered videos of Malcolm and J.C. engaging in sexual acts at earlier points in time, apparently when both were fully conscious. These video recordings, however, are not included in the record.

> Monday morning on jury selection and say oh, by the way, we
> found witness A, B and C that we want to now get in. You need
> to exercise your due diligence to track down these witnesses.

[¶17.] The circuit court granted the State's motion in limine, but the court did not categorically foreclose any further effort to offer evidence of specific instances of J.C.'s sexual behavior. Instead, the court indicated that defense counsel could "bring this up again and I imagine we're going to be having hearings on this, but quite frankly what you've told me today . . . is not persuasive as to why I should find good cause for you and your client not to comply with the statute."

[¶18.] During his opening statement at trial, Malcolm's counsel referenced the idea that J.C. had consented in advance of her incapacity, characterizing the practice as "pass out sex." However, efforts to introduce evidence to develop this advance consent theory during the trial were unsuccessful. For instance, in his defense case, Malcolm sought to introduce evidence of J.C.'s sexual behavior from four witnesses, none of whom were the subject of a properly noticed Rule 412 motion. The four witnesses all testified during an offer of proof outside of the jury's presence. Each offered testimony about sexual conduct between Malcolm and J.C.—some of which concerned prior instances of sexual conduct between the two and some related to conversations in which J.C. had purportedly endorsed the idea of "pass-out sex" in connection with the events of October 27–28.

[¶19.] After hearing the proffered testimony, the circuit court denied admission, relying upon three principal grounds: 1) hearsay, based upon the fact the testimony related to J.C.'s out of court statements; 2) a lack of notice under Rule 412; and 3) the court's view that "advance consent" was not a valid defense to third-

degree rape. As to the last of these bases, the court indicated its legal research on the advance consent theory led it to conclude that Malcolm's asserted defense was not valid:

> Essentially the defendant as I understood it from your opening statement . . . was going to testify or you were going to attempt to present evidence on an issue wherein you say the victim in this matter said I intend to pass out and when I pass out I give you consent to have sex with me. Essentially when I become incapable of giving consent I give you consent to do what you want to do . . . . Based upon my research[,] . . . I don't find that to be a valid issue in this case. The idea of consent to the [c]ourt's mind has to go with it the ability to revoke consent, so the idea that you can give consent and then become incapable of giving consent . . . , I don't think that is a valid legal princip[le].

> ****

> And so . . . I am intending not to allow the defense to introduce any notion of in quotations pass out sex. I think pass out sex is by definition rape in the third degree[.]

[¶20.] Malcolm testified in his own defense and described the sequence of events from the time on October 27 when he and J.C. had filled her prescription at Walmart through the point at which Malcolm woke up to find J.C. unresponsive in the afternoon on October 28 and called 911. As Malcolm was preparing to describe his second, fateful sexual encounter with J.C. on the morning of October 28, he testified that J.C. had told him to "make love" to her before he went downstairs to shower. This comment prompted an objection, which the circuit court sustained based upon its previous ruling. And Malcolm, for his part, did not further describe, before the jury or through an offer of proof, anything that would suggest J.C. consented in advance to the acts of sexual penetration Malcolm ultimately performed on J.C. while she was unresponsive.

[¶21.]     The jury convicted Malcolm on nine counts of rape in the third degree, opting for the alternate theory of criminal liability set out in SDCL 22-22-1(4), which prohibits sexually penetrating any person "incapable of giving consent because of any intoxicating, narcotic, or anesthetic agent . . . ." The circuit court sentenced Malcolm to a total of 50 years in prison with fifteen years suspended.[2]

[¶22.]     Malcolm appeals raising several issues for our review that we restate as follows:

1.    Whether the circuit court erred by determining that Malcolm's theory that J.C. gave "advance consent" to the instances of sexual penetration for which he was charged was not a legally valid defense that could be supported by evidence and argument.

2.    Whether the circuit court abused its discretion by ruling that evidence of specific instances of J.C.'s sexual behavior was inadmissible under Rule 412.

3.    Whether the circuit court committed plain error by not providing the jury with an instruction further defining the intoxication element of third-degree rape under SDCL 22-22-1(4).

4.    Whether the circuit court committed plain error by admitting video evidence of the charged offenses without first viewing the videos.

5.    Whether exceptional circumstances justify review of Malcolm's ineffective assistance of counsel claim on direct appeal.

---

2.    The circuit court imposed a 20-year sentence on count 1 and a 15-year sentence on count 2, to be served consecutively. The court suspended the 15-year sentences on the remaining counts which were concurrent to each other and consecutive to the sentences for counts 1 and 2.

## Analysis and Decision

### *Advance Consent*

[¶23.]     At the heart of Malcolm's broad argument that the circuit court erroneously refused him the opportunity to "tell his story" lies the premise that his advance consent theory was a valid defense. If it was not, Malcolm cannot prevail on his principal claim that the court unjustifiably restricted his defense in this regard. If, on the other hand, we were to hold that the court erred in its determination, Malcolm's arguments about the exclusion of evidence would merit further consideration. We view the efficacy of Malcolm's advance consent defense theory as a legal question of statutory interpretation, which we review de novo. *State v. Bowers*, 2018 S.D. 50, ¶ 16, 915 N.W.2d 161, 166.

[¶24.]     The text of SDCL 22-22-1(4) defines third-degree rape as "an act of sexual penetration accomplished with any person under . . . the following circumstances: . . . the victim is incapable of giving consent because of any intoxicating, narcotic, or anesthetic agent. . . ." As a matter of statutory interpretation, the plain and unambiguous text of SDCL 22-22-1(4) makes it a crime to perform "an act of sexual penetration" upon a person "under circumstances" in which the person "is *incapable of giving consent*[.]" (Emphasis added.) Under this uncomplicated reading of the statute, the act of sexual penetration and the inability to give consent must be contemporaneous, meaning a person is guilty of third-degree rape if at the time the person accomplishes an act of sexual penetration, the victim is incapable of giving consent.

[¶25.]     Here, Malcolm's formulation of "advance consent" skews the concept of consent into an unrecognizable misnomer under which a victim's inability to provide contemporaneous consent at the time of sexual penetration becomes irrelevant. Malcolm's advance consent theory is, as the name suggests, founded upon his view that although J.C. was *not* able to consent during the acts of sexual penetration at issue, she instead "consented" at an earlier time. Indeed, the other term used by Malcolm in this case—pass-out sex—can only be understood to mean that J.C. was incapable of consenting when Malcolm was sexually penetrating her.

[¶26.]     Apart from the fact that the text of SDCL 22-22-1 forecloses Malcolm's argument, accepting Malcolm's advance consent theory would create a rule under which victims who initially express consent to an act of sexual penetration are irrevocably bound by it later during the actual act, even if they have subsequently lost the ability to consent. The stark results of such a determination are easy to imagine. For example, a victim could express consent to sexual penetration in general terms, lose consciousness, and be unable to withdraw consent to further sexual penetration or to object to specific types of sexual penetration that were not originally contemplated.

[¶27.]     For this reason, we agree with the circuit court's conclusion that the ability to consent must necessarily contemplate the concomitant ability to withdraw consent at any point during a sexual encounter. We reached a similar conclusion in *State v. Jones*, where we affirmed the circuit court's decision to refuse a jury instruction that would have told jurors that no rape occurs if a victim withdraws consent after penetration. 521 N.W.2d 662, 672 (S.D. 1994).

[¶28.]     We are not alone in our view that the ability to consent to sex includes the ability to withdraw consent as an integral component.  For example, a California intermediate appellate court rejected a defendant's advance consent theory very similar to the one Malcolm makes here:

> While a woman may expressly or impliedly consent to conscious sexual intercourse in advance, she remains free to withdraw that consent, and ordinarily has the ability to do so since she is conscious.  Even if a woman expressly or impliedly indicates in advance that she is willing to engage in unconscious sexual intercourse, a man who thereafter has sexual intercourse with her while she is unconscious necessarily deprives her of the opportunity to indicate her lack of consent.  The inherent risk that a man may misinterpret a woman's prior statements or conduct weighs strongly against recognizing "advance consent" as a defense to rape of an unconscious person since the woman's lack of consciousness absolutely precludes her from making her lack of consent known at the time of the act.

*People v. Dancy*, 124 Cal. Rptr. 2d 898, 911 (Cal. Ct. App. 2002).

[¶29.]     Similarly, a Virginia court of appeals recently held,

> [C]onsent to engage in sexual acts must be ongoing and capable of being withdrawn at any time.  To hold that a person can give prior consent to sexual activity taking place when they are asleep would deny that person the ability to withdraw that consent.

*Conley v. Commonwealth*, 871 S.E.2d 640, 650 (Va. Ct. App. 2022).

[¶30.]     Accordingly, we conclude that the Legislature intended "incapable of giving consent" in SDCL 22-22-1(4) to be oriented to the time of the act of sexual penetration and to contemplate the corresponding ability to withdraw consent at any time.  To hold otherwise would institute an untenable rule licensing irrevocable consent to sexual penetration, a concept we emphatically reject.  For this reason, the circuit court's decision to refuse the admission of Malcolm's four witnesses who

testified during the offer of proof and the court's decision to sustain the State's objection to Malcolm's testimony that J.C. told him to "make love" to her are affirmed.[3]

### Rule 412 and Allegations Regarding Prior Sexual History

[¶31.] Malcolm's additional claim that the circuit court abused its discretion when it "refused to allow . . . any evidence . . . [that] he and JC had a longstanding and intimate relationship . . ." directly implicates Rule 412. We review evidentiary rulings under our abuse of discretion standard. *State v. Shelton*, 2021 S.D. 22, ¶ 16, 958 N.W.2d 721, 727.

[¶32.] Rule 412 provides that evidence is inadmissible if "offered to prove that a victim engaged in other sexual behavior . . . [or] a victim's sexual predisposition." SDCL 19-19-412(a). This general prohibition is subject to certain narrow exceptions, *see* SDCL 19-19-412(b), but Malcolm does not argue that any of the statutory exceptions apply to the evidence of J.C.'s prior sexual conduct.[4] Instead, now represented on appeal by a different attorney, Malcolm's Rule 412 arguments

---

3. There was no offer of proof from Malcolm himself as to what J.C. told him regarding advance consent. Malcolm's mother, Debra Tobin, testified during an offer of proof that she overheard J.C. say "something about I might be passed out or sleeping when you get back [from a shower], so you can just record it like we do so we can watch it she said." Stacy Thennis, who is a friend and former girlfriend of Malcolm's, testified during her offer of proof that J.C. had told her on October 27 that she and Malcolm planned to "get drunk" and then "have pass out sex."

4. The only proof in the record of J.C.'s prior sexual conduct comes from portions of the testimony provided by the four witnesses who testified during Malcolm's offer of proof. For example, Malcolm's sister, Amanda First in Trouble, testified that J.C. once related that she and Malcolm never deprive each other of sexual intercourse. Another witness, Sarah Waldner, testified that she and J.C. spoke to each other about their sexual interests.

focus upon his claim that his trial counsel rendered ineffective assistance for, in his view, failing to understand and comply with Rule 412's requirements for notice.[5]

[¶33.] Notwithstanding this noncompliance, we make two additional observations. First, the circuit court was keenly aware of Rule 412's provisions and stated its willingness to consider, or reconsider, the issue of J.C.'s prior sexual conduct if there was a basis to determine the existence of good cause and excuse the 14-day notice requirement. Second, the court did not completely bar all testimony from the four offer-of-proof witnesses. Instead, the court carefully considered different aspects of the witnesses' testimony and offered its assessment as to discrete portions. For instance, Malcolm's mother stated that J.C. came downstairs at some point that morning to find a bandage for the cut on her head, and the court determined this testimony could be relevant to establishing a timeline for the sequence of events.

[¶34.] Under the circumstances, we conclude that the circuit court followed the procedural requirements of Rule 412 and did not abuse its discretion. The circuit court's ruling could also be sustained based upon the court's determination that the evidence lacked relevance and constituted hearsay, neither of which Malcolm challenges on appeal. Accordingly, the decision to exclude evidence of J.C.'s sexual conduct was within the range of permissible choices available to the circuit court.

---

5.      We address Malcolm's ineffective assistance of counsel claim below.

*Intoxication Instruction*

[¶35.]     Malcolm argues that the circuit court erred by failing to instruct the jury on a definition of intoxication and by not instructing the jury to take into account the totality of the circumstances in evaluating whether J.C. was intoxicated. Because Malcolm did not propose the jury instructions he now argues should have been included or object to the jury instructions at trial, we review his argument for plain error. *See State v. Thomas*, 2011 S.D. 15, ¶ 20, 796 N.W.2d 706, 713 (holding that review is limited to plain error where a defendant did not preserve his claim by proposing a jury instruction).

[¶36.]     In order "[t]o establish plain error, an appellant must show (1) error, (2) that is plain, (3) affecting substantial rights; and only then may this Court exercise its discretion to notice the error if, (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *State v. McMillen*, 2019 S.D. 40, ¶ 13, 931 N.W.2d 725, 729–30 (quoting *State v. Bausch*, 2017 S.D. 1, ¶ 27, 889 N.W.2d 404, 412). The defendant "bears the burden of showing the error was prejudicial." *Id.* (quoting *State v. Beck*, 2010 S.D. 52, ¶ 10, 785 N.W.2d 288, 293).

[¶37.]     We have held that "[a] circuit court should instruct the jury on issues that are 'supported by competent evidence in the record[.]'" *City of Rapid City v. Big Sky, LLC*, 2018 S.D. 45, ¶ 21, 914 N.W.2d 541, 547 (quoting *Johnson v. Armfield*, 2003 S.D. 134, ¶ 7, 672 N.W.2d 478, 481). Malcolm's argument that the circuit court should have instructed the jury to consider the totality of the circumstances in evaluating whether J.C. was intoxicated does little to convince us any error was committed, much less plain error.

[¶38.]      Indeed, there does not appear to be any evidentiary dispute that J.C. was intoxicated at the time of the charged offenses. Compounding Malcolm's highly incriminating cell phone recordings plainly showing J.C.'s unresponsive state during the charged acts and the corresponding expert testimony that the degree of consciousness she displayed in the videos was akin to her being "asleep," the jury also viewed body camera footage of Malcolm telling police officers J.C. was "really fucked up" after their night of drinking. Under the circumstances, we conclude the circuit court did not erroneously fail to act on its own and give the instructions Malcolm now feels were necessary.[6]

***Graphic Videos of the Charged Conduct***

[¶39.]      Malcolm also failed to preserve his appellate claim that the circuit court erred by admitting the graphic video recordings of the charged offenses without first conducting a Rule 403 balancing test and without first viewing the evidence. There was no objection to the admission of this evidence at trial and no request for the court to view the video recordings before determining their admissibility.[7] "Where an issue has not been preserved by objection at trial, our

---

6.      Malcolm makes no claim that would satisfy the remaining elements of the plain error test—namely, that the error alleged was plainly contrary to controlling law, affected his substantial rights, and seriously affected the integrity of the judicial system. *See State v. Fischer*, 2016 S.D. 1, ¶ 16, 873 N.W.2d 681, 688 (determining that the circuit court did not commit plain error where the party failed to show how the alleged error prejudiced the party).

7.      Malcolm's effort to support his argument by citing the Third Circuit Court of Appeals' decision in *United States v. Cunningham*, 694 F.3d 372 (3d Cir. 2012), is misplaced. In *Cunningham*, the three-judge panel held that the district court had abused its discretion by not viewing video recordings of

(continued . . .)

review is limited to whether the trial court committed plain error." *State v. Wilson*, 2020 S.D. 41, ¶ 17, 947 N.W.2d 131, 136 (quoting *Thomas*, 2011 S.D. 15, ¶ 20, 796 N.W.2d at 713).

[¶40.]     Applying the principles of plain error review discussed above, we are unaware of any controlling rule which would *require* the circuit court to view the evidence and sua sponte balance its probative force against the potential for unfair prejudice under Rule 403.  Malcolm, for his part, has not argued otherwise or sustained his burden to establish the requirements of the plain error test, and our review is therefore at an end.

### *Ineffective Assistance of Counsel*

[¶41.]     "[A]bsent exceptional circumstances, we will not address an ineffective assistance claim on direct appeal." *State v. Vortherms*, 2020 S.D. 67, ¶ 30, 952 N.W.2d 113, 120–21 (quoting *State v. Golliher-Weyer*, 2016 S.D. 10, ¶ 8, 875 N.W.2d 28, 31).  "The rule is a practical one, necessitated by the fact that 'the record on direct appeal typically does not afford a basis to review the performance of trial counsel.'" *State v. Alvarez*, 2022 S.D. 66, ¶ 34, 982 N.W.2d 12, 20 (quoting *Vortherms*, 2020 S.D. 67, ¶ 30, 952 N.W.2d at 120; *see also Thomas*, 2011 S.D. 15, ¶ 23, 796 N.W.2d at 714 ("The reason is to allow attorneys charged with

---

(. . . continued)

child pornography before allowing their admission at the defendant's trial on federal child pornography charges.  However, the issue was carefully preserved through the defendant's pretrial motion in limine and pretrial litigation that was focused upon the defendant's detailed descriptions of the video clips, his acknowledgement that they contained child pornography, and his claims of unfair prejudice.  This distinction alone renders *Cunningham* inapposite, and we need not consider further whether the decision possesses any persuasive value.

ineffectiveness to explain or defend their actions and strategies, and thus a more complete picture of what occurred is available for review." (cleaned up)).

[¶42.]     "[O]nly when trial counsel was 'so ineffective and counsel's representation so casual as to represent a manifest usurpation of the defendant's constitutional rights'" will we attempt to resolve his claim on direct appeal. *Thomas*, 2011 S.D. 15, ¶ 23, 796 N.W.2d at 714 (quoting *State v. Arabie*, 2003 S.D. 57, ¶ 20, 663 N.W.2d 250, 256). "Where this standard is not met, the better course is to consider a defendant's Sixth Amendment ineffective assistance claim within the context of a habeas corpus action where the parties may develop the factual record." *Alvarez*, 2022 S.D. 66, ¶ 35, 982 N.W.2d at 20 (citing *Vortherms*, 2020 S.D. 67, ¶ 30, 952 N.W.2d at 120).

[¶43.]     Malcolm attributes several errors to his trial counsel that, he claims, entitle him to relief in this direct appeal. Among them are assertions that trial counsel only filed one pretrial motion, failed to file a Rule 412 motion, sent an unprepared associate to argue at the motion in limine hearing, did not object to video evidence on foundation and relevance grounds, did not file a motion regarding prior bad acts, and did not obtain a toxicologist expert witness. However, we cannot determine under the current record that defense counsel's performance was so patently ineffective under the standard set out above so as to support review of Malcolm's claims now. We, therefore, decline to address Malcolm's claim of ineffective assistance of counsel on direct review.

[¶44.]     We affirm.

#29644

[¶45.]    JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN,

Justices, concur.